UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------x

PANTELIS CHRYSAFIS, BETTY COHEN,
BRANDIE LACASSE, MUDAN SHI, and
FENG ZHOU,

                    *Plaintiffs*,

                    -against-

LETITIA JAMES, in her official capacity as
Attorney General of the State of New York,

                    *Defendant*.

----------------------------------------------------------x

No. _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Pantelis Chrysafis, Betty Cohen, Brandie LaCasse, Mudan Shi, and Feng Zhou (the "Plaintiffs"), by and through their attorneys, Gibson, Dunn & Crutcher LLP, for their Complaint against Defendant Letitia James, in her official capacity as Attorney General of the State of New York, allege as follows:

## NATURE OF THE ACTION

1.      This case challenges the constitutionality of New York State's new eviction moratorium law, Part A of the COVID-19 Emergency Eviction and Foreclosure Prevention Act of 2020 ("CEEFPA"), attached hereto as Exhibit A.  CEEFPA extends a temporary eviction moratorium into a more than year-long eviction-free span that has pushed so many of the State's small property owners, like Plaintiffs here, to the brink of financial and emotional disaster, and that tramples on their constitutional rights.  CEEFPA effectively frees tenants from any consequence for refusing to pay their rent obligations, and for overstaying the expiration of their leases.  At the same time, this moratorium forces small landlord owners like Plaintiffs here to continue to cover the considerable costs of carrying these properties without deriving any

income, thereby threatening their ability to cover the costs of their own mortgages and causing them irreparable harm.

2.      CEEFPA tramples on Plaintiffs' constitutional rights in at least five significant, separate ways:  *First*, CEEFPA impermissibly compels property owners to disseminate government messages with which they disagree in violation of their First Amendment rights. Property owners must distribute "hardship declaration" forms drafted by the government to tenants, a copy of which is attached hereto as Exhibit B.  In these forms, tenants are invited to take advantage of the eviction moratorium by checking a box stating, *inter alia*, that the tenant is "experiencing financial hardship" and therefore "unable to pay" the rent owed due to COVID-19, or that vacating the premises would pose a "significant health risk."  Landlords must also provide tenants with a government-curated list of legal service providers that are available to assist the tenants in seeking to avoid eviction.  Landlords are required to pay for the printing and mailing of these lists and forms, and to arrange and pay for the translation of the forms into certain languages spoken by their tenants.  In essence, the State is forcing property owners to speak in support of a government eviction moratorium program with which they disagree and to recommend specific legal organizations whose mission and advice is squarely adverse to landlords' interests.  This is unconstitutional compelled speech.

3.      *Second*, CEEFPA is void for vagueness under federal and state Due Process clauses, as it enables tenants to foreclose eviction and forsake their rental obligations by declaring hardship based on undefined "[s]ignificant loss of household income," "[i]ncrease in necessary out-of-pocket expenses," or "other circumstances" purportedly related to the COVID-19 pandemic, among other vague and undefined categories, inviting abuse and arbitrary enforcement.  *Third*, CEEFPA violates property owners' procedural due process rights under the

federal and state Due Process clauses by providing them with *no way* to challenge or verify tenants' declarations of hardship.  *Fourth*, because CEEFPA prohibits landlords from exercising their rights to file eviction petitions against tenants who have submitted these declarations until at least May 1, 2021 (after barring them from doing so through February 26, 2021 even without a hardship declaration), it violates Plaintiffs' rights under the First Amendment's and state constitution's Petition clause.  *Fifth*, in granting the chief administrative judge the unchecked power to unilaterally extend the eviction moratorium statewide, CEEFPA violates the delegation of power under the New York State Constitution.

4.      Plaintiffs seek a declaration that CEEFPA is unconstitutional.  Plaintiffs seek preliminary and permanent injunctive relief barring CEEFPA's further implementation and enforcement.

5.      The State's first eviction moratorium, imposed via Executive Order on March 20, 2020, barred the "enforcement" of evictions of residential and commercial tenants.  On May 7, 2020, in a second Executive Order, the State went a step further and barred the initiation of new proceedings, in addition to prohibiting the enforcement of evictions.  This second iteration and a subsequent law continued the moratorium on evictions applied to tenants facing a "financial hardship" due to or during COVID-19.

6.      CEEFPA goes even farther in imposing a blanket stay on nearly all summary proceedings, new or pending, staying all eviction proceedings until at least May 1, 2021 if tenants provide a hardship declaration in the form set out in the law (after staying proceedings through February 26 even without one).  Many landlords—including some Plaintiffs—have already received completed hardship declarations from their tenants in advance of the February

3

26 expiration of the automatic stay, while others—including some Plaintiffs—will be required to provide hardship declaration forms to their tenants starting on February 26.

7.     In many cases, landlords are already approaching a full year of not being able to seek rental income from tenants who refuse to pay their obligations, and are consequently unable to offset their mortgage payments and property taxes.  With this latest—and most severe— iteration, many property owners may not be able to pay their mortgages or otherwise meet their financial obligations, leading to the loss of their properties and other irreparable harms.

8.     Plaintiffs are five small property owners whose tenants have refused to pay rent for extended periods—often starting before COVID-19 began—whose tenants refuse to move out even though their leases have expired, and/or whose tenants are subject to eviction orders that cannot now be enforced because of CEEFPA.  They are each suffering irreparable harms as a result:

- Plaintiff Pantelis Chrysafis is the owner of a single-family home in Garden City, New York, which he currently rents out to tenants.  In early 2019, Chrysafis determined to try to sell the property again, and he informed the tenants that they would have a number of months to find a suitable, alternative place to live.  The tenants simply stopped paying rent as a result.  In the spring of 2019—well before the COVID-19 pandemic—Chrysafis was forced to hire an attorney to seek back rent.   The parties temporarily settled, but his tenants failed to pay timely rent again in December 2019 and January 2020.  In February 2020, Chrysafis obtained a judgment against his tenants as well as a warrant of eviction ordering the tenants to vacate by April 1, 2020.   Chrysafis's tenants nevertheless remain in the home because of the eviction moratoria.  They have not paid rent in over a year, totaling more than $70,000. Chrysafis has been forced to borrow money from his elderly parents to stay afloat.  His inability to collect rental income, while still having significant costs of his own, has caused unending strife within his own family.  Forcing Chrysafis to provide the hardship declaration to his tenants will in essence invite his tenants to continue to refuse to pay rent.  And his tenants will certainly avail themselves of the vagueness of the hardship declaration form to assert financial hardship.  But the timeline makes clear that his tenants' failure to pay has nothing to do with COVID-19, and Chrysafis will have absolutely no way to contest his tenants' claims.

- Plaintiff Betty S. Cohen is the owner of a single co-op unit in Brooklyn, New York, which she currently rents out to a tenant.  Cohen is retired.  The rental income from the co-op is her primary source of financial support, together with Social Security payments.

Starting in March 2020, the tenant stopped paying rent. Despite Cohen sending him a monthly statement of arrears and notifying him of her desperate need for the rent, the tenant has been living in the co-op rent-free for nearly a year now. Cohen sent a notice of late payment, and initiated an eviction proceeding in September 2020. But CEEFPA has now barred Cohen from taking any meaningful action to evict the tenant, reclaim her property, or recoup unpaid rent. The tenant's annual lease expired in December 2020. On February 4, 2021, the tenant submitted what purports to be a hardship declaration form, checking the box for financial hardship. Cohen has no opportunity to contest his submission or receive clarification as to which category of financial hardship he claims applies. If the form is valid, she will not be able to evict her tenant, despite his non-payment and the expiration of his lease, because the tenant's submission of a declaration form stays her case until May 1, 2021. The tenant currently owes Cohen over $18,000 in unpaid rent, and that amount goes up each month with Cohen unable to act at all until May.

- Plaintiff Brandie LaCasse is a retired military veteran. She is a single mother who owns and manages six properties in New York. She has a service-connected disability, which has resulted in her being immunocompromised. LaCasse decided to sell one of her properties, a single family house in Rhinebeck, New York, in November 2020. Accordingly, she served the tenants with a notice of nonrenewal pursuant to the terms of the lease. The tenants stopped paying rent in response and have refused to vacate the property despite the fact that the lease's term has concluded. LaCasse filed a holdover proceeding against the tenants in December 2020, which was immediately dismissed as a result of CEEFPA. Immediately thereafter, her tenants completed a hardship declaration form, claiming hardship in connection with their need for childcare. But there is no indication that the tenants' childcare situation has been affected by COVID-19, as one tenant continues to work while the other continues to stay home, as they did pre-pandemic. To make matters worse, the tenants have violated numerous terms of the lease, causing significant damage to the property and resulting in multiple police calls in response to their conduct. Yet the mere submission of the declaration form—containing claims that LaCasse has no way to rebut or challenge—has barred her from taking any action to re-file suit to evict the tenants until May 2021. LaCasse has wanted to sell the Rhinebeck property for months, but no one will buy a home occupied by tenants who refuse to leave. She is thus trapped with a property that is both impossible to sell and does not generate income even to cover its ownership costs. To make up for her lost rental income and cover her financial obligations, LaCasse has been forced to take a new job, despite her immunocompromised status, increasing her risk of getting infected with COVID-19. The eviction moratorium is literally compelling her to risk her life in order to make ends meet. If LaCasse continues not to be able to collect rent, she may have no choice but to take yet another job, which will only increase the risk to her health and the possibility that she will get infected.

- Plaintiffs Mudan Shi and Feng Zhou (wife and husband) own a single-family home in Staten Island, New York, which they currently rent out to tenants. The rental income from the house helps cover their own rent obligations for their leased family home, which Shi and Zhou live in with their two young children and their three elderly parents. Shi

and Zhou were able to purchase the Staten Island home a few years ago, after working hard for many years and scrupulously saving. Starting in the spring of 2019—almost a year before the pandemic—the tenants stopped paying rent. Shi and Zhou are now owed over $50,000 in back rent, and without the rental income from the home they are financially strapped trying to keep up with the monthly expenses on the house and the rent for the home they live in with their family. They commenced a nonpayment action on October 31, 2019—well before the coronavirus pandemic—and obtained a judgment. But before the judgment could be enforced, the proceeding was stayed due to the eviction moratoria, and that has continued due to CEEFPA. Even though their tenants' lease has expired and the tenants have not paid rent for three quarters of the term, Shi and Zhou cannot move their own family into the house. Forcing them to provide the hardship declaration form to their tenants effectively invites the tenants to continue to live in the property without paying rent. And their tenants will certainly avail themselves of the vague hardship categories of the declaration form to assert hardship. The tenants' failure to pay is completely unrelated to COVID-19, yet Shi and Zhou would have absolutely no viable path forward to evict the tenants or even contest their tenants' claims.

9. The harms to these Plaintiffs and others similarly situated is not only to their economic viability but also to their constitutional rights. When a tenant defaults on a rent payment, property owners must produce a written rental demand at least fourteen days prior to pursuing a special proceeding to remove the tenant from the property. RPAPL § 711(2). Now, CEEFPA compels landlords to produce, with every written demand for rent, a form—the text of which is mandated by the government—inviting tenants to declare that they are "experiencing financial hardship" and therefore "unable to pay" the rent owed, or that vacating the premises would pose a "significant health risk," even though property owners may disagree with these statements made by their tenants and certainly do not support or approve of the resulting moratorium on evictions. Property owners are also required to provide tenants with "a list of all not-for-profit legal service providers actively handling housing matters in the county where the subject premises are located," which list is prepared by the government. The message is plain: tenants should seek legal advice from these owner-"recommended" organizations on how to avoid paying rent. The furnishing of this list thus forces Plaintiffs to support an expression, and organizations, that are directly adverse to their own interests. If landlords do not furnish the

hardship declaration form and legal service provider list to tenants—and attest in a signed affirmation that they have done so—landlords cannot initiate or make any movement in eviction proceedings.

10.     CEEFPA's hardship provision also violates property owners' Fourteenth Amendment due process rights because it is unconstitutionally vague.  CEEFPA Part A § 1(4) prohibits eviction of tenants who declare hardship based on any of various "hardships," including "[s]ignificant loss of household income," "[i]ncrease in necessary out-of-pocket expenses," and "other circumstances related to the COVID-19 pandemic," among other vague terms.  Yet it fails to provide any definition or guidance of any kind for these phrases, rendering the provision so ambiguous that landlords have no notice of the circumstances under which tenants will be exempted from state-law eviction remedies and no realistic means of predictable implementation. Furthermore, the statute does not even require that tenants identify the category of "financial hardship" that they assert applies to them and it fails to provide property owners' with an avenue to challenge declarations of hardship based on these self-reported circumstances.  The hardship declaration is a recipe and opportunity for abuse and arbitrary enforcement.

11.     In addition, CEEFPA's hardship provision violates property owners' procedural due process rights under the Fourteenth Amendment because the statute provides no mechanism to verify or challenge tenants' hardship declarations—irrespective of the hardship claimed—and automatically bars or stays eviction proceedings when such declarations are submitted.  Thus, property owners are bound by nothing more than tenants' say-so that they are suffering hardships such that they cannot be evicted.

12.     CEEFPA also violates the First Amendment's right to petition (and its state corollary), which has long been interpreted to protect access to the courts.  CEEFPA tramples on

property owners' rights to file summary eviction proceedings—a judicial remedy provided by state law—by categorically barring the filing of such proceedings in most cases where tenants submit a form declaring they are suffering hardship during the pandemic.

13.     Finally, CEEFPA violates the New York State Constitution—and compounds the right to petition violation—by purporting to delegate to the chief administrative judge unfettered discretion to indefinitely extend the eviction moratorium.  Article VI, § 30 of the New York Constitution, N.Y. Judiciary Law § 212, and numerous judicial decisions establish that the chief administrative judge can only exercise powers regulating practice and procedure in the courts with the advice and consent of the administrative board of the courts.  CEEFPA, however, allows the chief administrative judge alone to extend the eviction moratorium, and the associated stay of court proceedings, on a statewide basis, and in a blanket fashion.

14.     These Plaintiff, as small property owners, therefore bring this action challenging the constitutionality of Part A of CEEFPA on these many grounds.  They seek a declaration that CEEFPA Part A is unconstitutional, and they further seek emergency and permanent injunctive relief barring the State from further implementing or enforcing CEEFPA Part A in its entirety.

## PARTIES

15.     Plaintiff Pantelis Chrysafis is the owner of a single-family home in Garden City, New York, which he currently rents out to tenants.

16.     Plaintiff Betty Cohen is the owner of a single co-op unit in Brooklyn, New York, which she currently rents out to a tenant.

17.     Plaintiff Brandie LaCasse owns a single-family home in Rhinebeck, New York that she currently rents out to tenants.  She owns five additional properties in New York State that are also rented out to tenants.

18.      Plaintiffs Mudan Shi and Feng Zhou (wife and husband) own a single-family home in Staten Island, New York, which they currently rent out to tenants.

19.      Defendant Letitia James is the Attorney General of the State of New York and is responsible for defending the constitutionality of CEEFPA in this action as part of her duty under Executive Law § 63(1) to defend all actions and proceedings in which New York State is interested.  She is also responsible for enforcement of any violations of the statute.  The Attorney General maintains Executive Offices at The Capitol, Albany, New York 12224, and at 28 Liberty Street, New York, New York 10005.  The Attorney General is named in her official capacity.

## JURISDICTION AND VENUE

20.      This Court has subject matter jurisdiction over Plaintiffs' constitutional claims pursuant to 28 U.S.C. § 1331.

21.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL ALLEGATIONS

**I.    Eviction Proceedings Prior To The COVID-19 Pandemic**

22.      Prior to the COVID-19 pandemic, landlords were required to take a number of steps under New York Real Property Actions and Proceedings Law to resolve matters with tenants before initiating an eviction proceeding.  Tenants could be evicted, upon appropriate showings, in three principal instances: (1) when a tenant failed to pay the agreed-upon rent; (2) when a tenant severely violated a lease provision (including creating a nuisance); or (3) when a tenant stayed in the premises beyond the term of the lease (*i.e.* overstays).  RPAPL § 711.  Under the pre-COVID-19 regime, property owners also had certainty that a stay of the issuance or enforcement of an eviction warrant for unpaid rent would be granted only in certain defined circumstances.  They knew, for example, that stays could be granted if they failed to make

repairs or failed to pay for utilities; but they also knew the stays could be lifted once repairs were made or utilities were paid for and restored.  RPAPL §§ 755–56 (applies in or outside New York City).

23.     Such defined parameters gave property owners predictability in their businesses and lives while balancing tenants' needs with accountability.  Before COVID-19, it was also the case that stays of up to six months could be granted when hold-over tenants of "dwelling" units made an application in good faith that they could not secure a suitable alternative premises despite reasonable efforts, and that the tenant or the tenant's family would face extreme hardship if the stay were not granted.  RPAPL § 753.  But even in these instances, landlords or other petitioners had the opportunity to dispute a stay.  *See* RPAPL § 753(3) (landlords can establish a good faith desire to recover the unit in order to complete demolition and fulfill a new building construction plan).  Outside of New York City, landlords also knew that discretionary stays of eviction warrants were also limited to instances such as when a defaulted tenant pays all back rent, taxes, and other costs satisfactory to the court.  RPAPL § 751(1).

## II.     In March 2020, Governor Cuomo Ordered a Temporary Eviction Moratorium

24.     On March 20, 2020, Governor Cuomo issued Executive Order No. 202.8, which placed a 90-day blanket eviction moratorium over residential and commercial tenants.  On May 7, 2020, via Executive Order No. 202.28, Governor Cuomo extended the eviction moratorium until August 19, 2020; under this Executive Order, landlords were prohibited from moving to evict any tenants whose default was caused by financial hardship "due to COVID-19."  Executive Order No. 202.28 clarified that the moratorium barred property owners from *initiating* an eviction proceeding or enforcing an eviction warrant during the effective period.  Although Executive Order No. 202.28 did not further define financial hardship, it directed landlords to allow tenants' security deposits to be used to pay rent that became due, but only upon the consent

of a tenant suffering financial hardship due to COVID-19.  Once a tenant's security deposit was used to pay rent, the tenant was to replenish the deposit within ninety days with an amount equivalent to only 1/12 of the monthly rent.

### III.   In June 2020, The State Further Extended The Eviction Moratorium Via The Passage of the Tenant Safe Harbor Act

25.     On June 30, 2020, the State enacted the Tenant Safe Harbor Act ("TSHA"), which further extended the eviction moratorium over residential properties, and was twice extended by Executive Orders 202.66 and 202.85 at the end of 2020.  The TSHA places a prohibition on evictions against non-paying residential tenants who raise a "financial hardship" defense during a summary proceeding.  Rather than relying on the tenant's word alone, the TSHA gives landlords recourse in court to challenge a tenant's claim of financial hardship.  Courts were instructed to consider a number of factors such as the tenant's income before and after COVID-19, liquid assets, and public welfare benefits.  The TSHA's eviction prohibition is set to expire once no part of the county in which a tenant resides is shut down due to COVID-19 restrictions,[1] but the inquiry it directs courts to undertake has now been limited by CEEFPA, as discussed below.

### IV.   CEEFPA Extended And Expanded The "Temporary" Eviction Moratorium

26.     Signed into law on December 28, 2020, CEEFPA immediately stayed for sixty days all pending residential eviction proceedings,[2] even those that began on or before March 7, 2020—tying the hands of residential landlords until at least February 26, 2021.  The automatic

---

[1]  Ch. 127, § 1, 2020 N.Y. Laws (defining the covered period of the Act as being until "none of the provisions that closed or otherwise restricted public or private businesses or places of public accommodation, or required postponement or cancellation of all non-essential gatherings of individuals of any size" apply).

[2]  The statute defines an "eviction proceeding" as a either a summary proceeding to recover possession of real property under § 7 of NY Real Property Law, a judicial proceeding, or administrative proceeding to recover possession of real property.  Landlords as well as individuals who are entitled to possession of property, such as a reversioner, purchaser, or receiver, are among a short list of individuals who may pursue a summary proceeding.  RPAPL § 721.  No fees or penalties beyond lost rent may be recovered in summary proceedings.  RPAPL § 702.

sixty-day stay applies to any new proceedings commenced through January 27, 2021.  CEEFPA

also mandates that property owners provide their tenants with a "hardship declaration" (a

"Hardship Declaration") prior to commencing or continuing any eviction proceedings.  CEEFPA

Part A § 1(4).  If a tenant submits a Hardship Declaration, eviction proceedings—both pending

and new—are to be stayed until as late as May 1, 2021.  Proceedings will also be stayed until at

least that same date if a tenant submits a Hardship Declaration before the February 26, 2021

conclusion of the automatic sixty-day stay.  Meanwhile, tenants seeking money judgments

against landlords in summary proceedings may continue to do; no stay applies.

27.     The Hardship Declaration consists of (1) a declaration form (the "Declaration

Form") explaining that a completed, signed declaration will bar any eviction proceedings until

May 1, 2021; (2) a "pre-eviction notice"—which consists of "a list of all not-for-profit legal

service providers actively handling housing matters in the county where the subject premises are

located," prepared by the Office of Court Administration; and (3) a return address for the

Declaration Form.  *Id.* § 3.  CEEFPA compels property owners to provide tenants with a

Hardship Declaration "with every written rent demand for rent."  *Id.*  In addition, any property

owner who seeks to initiate an eviction proceeding, resume a pending eviction proceeding, or

execute an issued eviction warrant for any reason (outside of a tenant-caused nuisance) must first

provide a Hardship Declaration to the tenant.  *See id.* § 9.

28.     While the Office of Court Administration is obligated to produce translated

Declaration Forms in "Spanish and the six most common languages in the City of New York,

after Spanish," *id.* § 10, it is "the landlord's responsibility to obtain a suitable translation of the

hardship declaration in the tenant's primary language," *id.* § 3, if the tenant's "primary language"

is not one of the seven.  CEEFPA contains no clause authorizing property owners to obtain

reimbursement for following this mandate.  Nor does it free them from the anti-discrimination laws that otherwise forbid landlords from asking their tenants information about their national origin.  Yet they must somehow determine their tenants' "primary language," engage a reliable translation service to translate the Declaration Form if that language is anything other than the languages translated by the State, and cover the cost of translation.  In such cases, tenants will naturally infer that landlords—not the State—prepared the forms.

29.     The Declaration Form asks tenants to "select[]" one or both "option[s]" via checking a box—either that they are "experiencing financial hardship . . . during the COVID-19 pandemic" or that "moving . . . would pose a significant health risk"—to qualify for a stay of existing eviction proceedings or a suspension of new proceedings.  CEEFPA Part A §§ 1, 3; *see also* Ex. A (Hardship Declaration Form downloaded from New York Courts website), *available at* https://www.nycourts.gov/Courts/nyc/SSI/images/corona/HardshipDeclaration.pdf.

30.     A tenant need only "select[]" one of these two options, without explaining more, to submit a valid Declaration Form.  *See id.*; Ex. A.  While the Declaration Form contains a "notice" clause informing the tenant that he or she is "signing and submitting the form under penalty of law," *id.* § 1(4), the form does not need to be signed under penalty of perjury, and there is no requirement to attach corroborating documents to support the category chosen.  *Cf.*, *e.g.*, *id.* § 4 ("If there is no pending eviction proceeding and a tenant provides a hardship declaration to the landlord . . . there shall be no initiation of an eviction proceeding against the tenant until at least May 1, 2021").

31.     The Declaration Form lays out five possible grounds for meeting the financial hardship option—that is, grounds on which the tenant can assert that he or she is "unable to pay [his or her] rent or other financial obligation under the lease in full":  (1) a "significant loss of

household income," (2) increasing "necessary out-of-pocket expenses related to performing

essential work or related to health impacts," (3) "childcare [or other familial care] responsibilities

. . . negatively affect[ing]" the ability "to obtain meaningful employment" or causing "increased

[ ] necessary out-of-pocket expenses," (4) "moving expenses and difficulty [the tenant has]

securing alternative housing," or (5) a catch-all category of "[o]ther circumstances related to [ ]

COVID-19" that have "negatively affected" the tenant's ability "to obtain meaningful

employment or earn income or have significantly reduced [the tenant's] household income or

significantly increased [] expenses." *Id.* § 1(4).  Per the plain language of the statute, embodied

in the Declaration Form issued by the Office of Court Administration, tenants are not required to

identify the particular subcategory the tenant claims applies.  Therefore, property owners

receiving completed Declaration Forms are not even informed of the specific asserted

justification for the tenant's non-payment.

     32.     Tenants are instructed to return the Declaration Form to the property owner or, if

an eviction proceeding has already commenced, to the court.

     33.     Unless landlords like Plaintiffs file a signed affidavit—this one under the penalty

of perjury—with the court demonstrating that they have delivered a copy of the Hardship

Declaration to a tenant—including the "manner in which the petitioner[-landlord] or the

petitioner[-landlord]'s agent served a copy of the hardship declaration" and whether it was

served both "in English and the tenant's primary language"—and attest that they have not

"received" a completed Declaration Form in response, no property owner may commence an

eviction proceeding.  *Id.* § 5.

     34.     Though the law does not require confirmation or corroboration of the tenant's

affirmations in a Declaration Form, property owners are unable to commence an eviction without

14

a two-step inquiry over *their* delivery of the Hardship Declaration.  Once the court receives the landlord's affidavit in satisfaction of Part A § 5 it must first separately "determine whether a copy of the hardship declaration" in the appropriate language(s) "is annexed to the served notice of the petitioner" and, second, "seek confirmation on the record . . . that the [tenant] has received" the Hardship Declaration and has not returned a completed Declaration Form to the landlord, the landlord's agent, or the court.  *Id.* § 5(2).  Upon receipt of a tenant's Declaration Form, courts are directed further to toll the commencement of any new proceedings until May 1, 2021.  *Id.* § 4.  Receipt of a completed Declaration Form effectively freezes ongoing eviction proceedings and certain already-issued eviction warrants until that date.

35.     Under CEEFPA, the submission of a Declaration Form with the financial hardship option selected will create a "rebuttable presumption that the tenant is experiencing financial hardship" under the TSHA, an executive order, or other state or local laws.  CEEFPA Part A § 11.  Accordingly, tenants may continue to avail themselves of this presumption in future proceedings beyond the expiration of the moratorium on May 1, 2021.  The new law is silent on what type of evidence, if any, would rebut the presumption, or in what manner or forum such evidence may be submitted.  This step by the State effectively eliminates what little opportunity landlords had to check claims of financial hardship under the TSHA.

36.     The new law also vacates any default judgments authorizing an eviction in a residential eviction matter prior to December 28, 2020.  CEEFPA Part A § 7.  The matters underlying the vacated judgments can be restored to the court calendar for a new hearing solely upon the tenant's request, or else they will remain vacated.  No new default judgments or authorizations to enforce already issued eviction warrants can be issued before May 1, 2021.  Even if property owners wish to proceed, they must make a motion with the court and participate

in an initial hearing.  *Id.* §§ 7, 8.  But the reality remains that only two exceptions change the outcome for landlords.  The matter may only continue on from an initial hearing to a summary proceeding, if the landlord can "establish" either that the tenant is exhibiting behavior equivalent to a nuisance or that the tenant has failed to return a Declaration Form after being provided with one by the landlord.  *Id.* § 9.  In all other instances, the matter is stayed until May 1, 2021.  Even if a judgment *based on* nuisance was awarded to a landlord prior to December 28, 2020, courts are directed to hold another hearing to essentially redetermine whether the tenant's unreasonable behavior has persisted further.  *Id.* § 9(2).

37.    CEEFPA's sole legal carve-out permits eviction proceedings for tenant behavior constituting a nuisance.  The nuisance standard requires establishing that the tenant "substantially infringes on the use and enjoyment of other tenants or occupants or causes a substantial safety hazard to others."  CEEFPA Part A § 9(2).  The standard is similar to others in New York law concerning real property.  *See* N.Y.C. Admin. Code § 26-408 (describing eviction based on tenant committing "nuisance" or "maliciously or by reason of gross negligence substantially damaging the housing accommodation," acting in a manner that interferes "substantially with the comfort and safety of the landlord or of other tenants or occupants"); 9 N.Y.C.C.R.R. § 2524.3 (describing similar standard).

38.    Finally, CEEFPA purports to delegate to the chief administrative judge the power to extend the blanket, statewide stay of eviction proceedings beyond the initial sixty day period.  Specifically, it allows the chief administrative judge to unilaterally extend the stay—with no limit on the amount of time or number of extensions—if and to the extent doing so is "necessary," in his unilateral discretion, "to ensure that courts are prepared to conduct

proceedings in compliance with this act and to give tenants an opportunity to submit the hardship

declaration pursuant to this act."  CEEFPA Part A § 2.

39.     CEEFPA has effectively overridden the State's existing real property law regime

with respect to residential tenancies and replaced it with vaguer substantive directives as well as

unconstitutional landlord obligations.  In this inverse universe, all of Plaintiffs' active or

potential proceedings for unpaid rent are stayed and some will remain stayed until May—over a

year since the first eviction restrictions were put in place.

## V.     CEEFPA Permits Financial Hardship Declarations Based On Vague and Undefined Circumstances And Bars Landlords From Obtaining Review Of Such Claims

40.     As described above, CEEFPA sets out a number of categories of financial

hardship that a tenant can claim, based on loss of household income, increases in out-of-pocket

expenses related to essential work or "health impacts," loss of income or increased expenses

related to family care responsibilities, and moving difficulties and expenses.  CEEFPA Part A

§ 4(1)–(4).  These categories are vague and undefined.  Exacerbating the problematic vagueness

of these categories, CEEFPA permits tenants to declare hardship based on an assertion that

"other circumstances related to the COVID-19 pandemic" "negatively affected [their] ability to

obtain meaningful employment or earn income," "significantly reduced [their] household

income," or "significantly increased [their] expenses."  *Id.* § 4(5).  The law provides no

definitions whatsoever for any of these terms.

41.     Compounding the issue, and in keeping with CEEFPA's wholesale stripping of

owners' rights and structural bar on court access, the law provides no mechanism for landlords to

determine in eviction proceedings—let alone contest—the reasons for a declaration of financial

hardship based on "other circumstances."

42.     Where a tenant submits a Declaration Form to the property owner, "there shall be no initiation of an eviction proceeding against the tenant" until at least May 1, 2021.  CEEFPA Part A § 4.  To effectuate this prohibition, CEEFPA provides that "no court shall accept for filing" any eviction petition or other filing unless a landlord files an affidavit under penalty of perjury attesting that it (and its agents) have not received a Hardship Declaration or that CEEFPA's narrow nuisance exception applies.  *Id.* § 5(1).  Tenants, however, are not required to sign Hardship Declarations under penalty of perjury (and instead sign them only under "penalty of law," whatever that means.)  Similarly, an in-progress eviction proceeding is automatically stayed upon filing of a Hardship Declaration until at least May 1, 2021, and where an eviction warrant has been issued it may not be executed until at least the same date.  *Id.* §§ 6, 8.  Thus, while tenants sign their declarations under penalty of law, *id.* § 1(4), property owners are for all practical purposes powerless to challenge in an eviction proceeding a tenant's representation that "other circumstances" apply, making the category ripe for abuse.

43.     Each of the vague provision's infirmities is aggravated by the fact that a tenant's submission of a Declaration Form creates a rebuttable presumption of financial hardship in proceedings involving a defense under the TSHA, an executive order, or "any other local or state law, order or regulation restricting the eviction of a tenant suffering from a financial hardship during or due to COVID-19."  CEEFPA Part A § 11.  CEEFPA provides no explanation for the process or substantive standards by which the financial hardship presumption could be rebutted, rendering the already ill-defined "other circumstances" category hopelessly vague as to the covered proceedings.  Unlike many of CEEFPA's provisions, the rebuttable presumption provision does not contain a May 1 end date and appears to continue even after the pandemic is over.

44.     The contentless nature of the categories of hardship, the statute's creation of an ill-defined rebuttable presumption, and the lack of any mechanism to verify a tenant's submission are ripe for abuse and invite arbitrary application.

## VI.     Plaintiffs Are Suffering Under CEEFPA's Unconstitutional Regime

45.     Plaintiffs have been harmed in the manner described above by virtue of CEEFPA's eviction moratorium provisions, which independently and cumulatively violate their rights under the First Amendment's Free Speech clause, the Fourteenth Amendment's Due Process clause, and the First Amendment's Petition clause, as well as their New York State Constitution corollaries, and which unconstitutionally delegate legislative powers to the judicial branch.  Each Plaintiff, moreover, is suffering under CEEFPA as follows.

### A.     Plaintiff Pantelis Chrysafis

46.     Plaintiff Chrysafis purchased the single-family home he owns in Garden City, New York, in 2015, to live in with his then-wife.  After he and his wife separated, Chrysafis decided to sell the property, but did not find a suitable buyer.  Chrysafis identified what he believed to be suitable tenants instead, and started renting it out for $5,000 per month.  Between his $4,700 per month mortgage and approximately $18,000 in property taxes, Chrysafis was essentially breaking even.  Chrysafis now lives in Japan, where he has a newborn child.

47.     In early 2019, a few years into the tenancy, Chrysafis determined to try to sell the property again, and he informed the tenants that they would have a number of months to find a suitable, alternative place to live.  The tenants simply stopped paying rent as a result.  In the spring of 2019—well before the COVID-19 pandemic—Chrysafis was forced to hire an attorney to seek five months of back rent.   The parties temporarily settled, but his tenants failed to pay timely rent again in December 2019 and January 2020.  In February 2020, Chrysafis obtained a judgment against his tenants as well as a warrant of eviction ordering the tenants to vacate by

April 1, 2020.  Just days before COVID-19-related shutdowns began, the tenants requested until the end of April to vacate, and Chrysafis agreed.

48.     Chrysafis's tenants remain in the home because of the eviction moratoria.  They have not paid rent in over a year, totaling more than $70,000. Chrysafis has been forced to borrow money from his elderly parents to stay afloat.  His inability to collect rental income, while still having significant costs of his own, has caused unending strife within his own family.  If it continues to be enforced, CEEFPA will extend the stay of Chrysafis's eviction proceedings against his tenants.  Forcing Chrysafis to provide the Hardship Declaration to his tenants will in essence invite his tenants to continue to refuse to pay rent.  And his tenants will certainly avail themselves of the vagueness of the Declaration Form to assert financial hardship.  But the timeline makes clear that his tenants' failure to pay has nothing to do with COVID-19, and Chrysafis will have absolutely no way to contest his tenants' claims.

### B.     Plaintiff Betty Cohen

49.     Plaintiff Cohen owns a one-unit co-op in Brooklyn, New York that she rent outs to a tenant.  Cohen is retired.  The rental income from the co-op is her primary source of financial support, together with social security payments.

50.     Cohen has rented the co-op unit to a single tenant since 1995.  The current rent is $1,545 per month.  Cohen is responsible for paying for the co-op maintenance fees amounting to $631 per month, which she ordinarily pays using the rental income.  The tenant has a mixed history of cooperation when it comes to the co-op fees and rent.  Although the rent is due on the 15th of each month, he has taken every opportunity to extend that deadline.  He also refused to pay the required fifty dollar deductible on repairs after Cohen made a repair costing her $1,100.  In March 2020, the tenant did not pay rent.  Although Cohen agreed to allow him to pay it back the following month and waived the late charge, the tenant never paid.  Despite Cohen sending

him a monthly statement of arrears and notifying him of her desperate need for the rent, the tenant has now been living in the co-op rent-free for nearly a year.  The tenant has refused to communicate with Cohen about the unpaid rent and does not respond to her messages at all.

51.    Cohen sent a notice of late payment, and initiated a non-payment proceeding in September 2020.  But the series of eviction moratoria, including CEEFPA, have barred Cohen from taking any meaningful action to evict the tenant, reclaim her property, or recoup unpaid rent.  The tenant's annual lease expired in December 2020.  On February 4, 2021, the tenant submitted what purports to be a Declaration Form, checking the financial hardship box without any further explanation or support.  If the form is valid, Cohen will have no opportunity to contest his submission or receive clarification as to which category of financial hardship he claims applies.  And the tenant's submission of a Declaration Form will automatically stay her case until May 1, 2021, despite his non-payment and the expiration of his lease.  The tenant currently owes Cohen nearly $19,000 in unpaid rent, and that amount goes up each month.

52.    Still obligated to cover her own living and fixed monthly costs, Cohen has resorted to asking friends to help support her.  They have graciously sent her what they can.  But if Cohen remains unable to evict the tenant and thereby barred from finding a tenant who will pay rent, she will not be able to continue to pay her own financial expenses and may lose her rental unit.

### C.    Plaintiff Brandie LaCasse

53.    Plaintiff LaCasse is a military veteran, now retired after serving her country for more than 23 years of active-duty service.  She is a single mother who owns six properties in New York, and she serves as the manager of each.  She has a service-connected disability, which has resulted in her being immunocompromised

54.     LaCasse decided to sell one of her properties, a single family house in Rhinebeck, New York, in November 2020.  Accordingly, she served the tenants with a notice of nonrenewal pursuant to the terms of the lease.  The tenants stopped paying rent in response.  LaCasse is now owed approximately $6,700 in unpaid rent and the tenants have refused to vacate the property despite the fact that the lease's term has concluded.  LaCasse filed a holdover proceeding against the tenants in December 2020, but it was dismissed because she had not provided a Hardship Declaration to her tenants—even though CEEFPA was not yet in effect when she had filed suit.  Immediately thereafter, her tenants completed a Declaration Form, claiming financial hardship in connection with their need for childcare.  But there is no indication that the tenants' childcare situation has been affected by COVID-19, as one tenant continues to work while the other continues to stay home, as they did pre-pandemic.  To make matters worse, the tenants have violated numerous terms of the lease, causing significant damage to the property and resulting in multiple police calls in response to their conduct.  Yet the mere submission of the Declaration Form—containing claims that LaCasse has no way to rebut or challenge—has barred her from taking any action to evict the tenants until May 2021.  LaCasse has wanted to sell the Rhinebeck property for months, but no one will buy a home occupied by tenants who refuse to leave.  She is thus trapped with a property that is both impossible to sell and does not generate income even to cover its ownership costs.

55.     Tenants in LaCasse's other properties now also believe they can refuse to pay rent with impunity.  In January 2021, tenants at a different property paid their rent late and told LaCasse that she should consider herself lucky to receive any payments at all.  In February 2021, they did not pay any of their $1,900 monthly rent.  They have told her they do not have to pay their rent because it is impossible for her to take them to court.

56.     To make up for her lost rental income and cover her financial obligations, LaCasse has been forced to take a new job, despite her immunocompromised status, increasing her risk of getting infected with COVID-19.  The eviction moratorium is literally compelling her to risk her life in order to make ends meet.  And she is no longer able to spend time with her daughter because she has been forced to take this additional work.  If LaCasse continues not to be able to collect rent, she may have no choice but to take yet another job, which will only increase the risk to her health and the possibility that she will get infected.

### D.     Plaintiffs Mudan Shi and Feng Zhou

57.     Plaintiffs Shi and Zhou own a single-family home in Staten Island, New York. The rental income from the house helps cover their own rent obligations for their leased family home, which Shi and Zhou live in with their two young children and their three elderly parents.

58.     Shi and Zhou were able to purchase the Staten Island home in 2014 after working hard for many years and scrupulously saving.  They lived in the house until 2018 when they decided to rent it out.  In August 2018, Shi and Zhou rented the house to a tenant, who agreed to a two-year lease with a monthly rent of $2,400.  The tenant paid rent from August 2018 through March 2019, but in April 2019 the tenant paid only half the rent due.  He has not paid any rent since.  Shi and Zhou are now owed over $50,000 in back rent, and without the rental income from the house they are financially strapped trying to keep up with the property taxes and water bills on the house as well as  their own rent of $2,200 per month.  They commenced a nonpayment action on October 31, 2019—well before the coronavirus pandemic.  Although they obtained a favorable judgment, the enforcement of that judgment has been stayed due to the eviction moratoria.

59.     In August 2020, when the lease was set to expire, Shi and Zhou asked the tenant to leave the home so they could move in with their family and be relieved of their rent

obligations on the home they had been renting out.  The tenant offered to vacate only if Shi and Zhou gave him $10,000.  Once Shi and Zhou agreed to a $6,000 payment, the tenant turned and demanded the money *before* he moved out.  Shi and Zhou did not feel comfortable paying under this condition.  They have been stuck in a Catch-22 ever since:  unable to meet the monthly rent obligations under their lease because they cannot obtain the supporting rental income from their own tenant.  Even though their tenant's lease has expired and he has not paid rent for three quarters of the term, Shi and Zhou cannot move their own family into the house they own.

60.     CEEFPA's continued enforcement would further extend the stay on the enforcement of the judgment that Shi and Zhou won during their non-payment proceeding as well as any future eviction proceeding, should they attempt to commence one.  Forcing them to provide the Hardship Declaration to their tenants effectively invites the tenants to continue to live in the property without paying rent.  And their tenants will certainly avail themselves of the vague hardship categories of the Declaration Form to assert hardship.  The tenants' failure to pay is completely unrelated to COVID-19, yet Shi and Zhou would have no path forward to contest their tenants' claims.

## CEEFPA PART A IS INVALID IN ITS ENTIRETY

61.     Since the unconstitutional Hardship Declaration is at the "core" of Part A of CEEFPA and "interwoven inexplicably through the entire regulatory scheme," *New York State Superfund Coal. v. New York State Dept. of Envtl. Conservation*, 75 N.Y.2d 88, 94 (1989), CEEFPA Part A is invalid in its entirety.  The Hardship Declaration is referenced at least 60 times throughout Part A, including in virtually every operative provision.  It would be "pragmatically impossible, as well as jurisprudentially unsound," for the court to "attempt to identify and excise" the Hardship Declaration, or the provisions in which it is referenced, while "leaving the remainder of" CEEFPA Part A intact.  *Boreali v. Axelrod*, 71 N.Y.2d 1, 14 (1987);

24

*see also Nat'l Advert. Co. v. Town of Babylon*, 900 F.2d 551, 557 (2d Cir. 1990) (finding

constitutional and unconstitutional provisions of town ordinance restricting commercial speech

were inextricably interwoven and that the unconstitutional portions therefore could not be

severed from constitutional portions).

<u>FIRST CAUSE OF ACTION</u>
**Compelled Speech – First Amendment of the U.S. Constitution and Article I, § 8 of the
N.Y. Constitution; 42 U.S.C. § 1983**

62.     Plaintiffs repeat and reallege the allegations set forth above as though fully set

forth herein.

63.     The First Amendment's Free Speech clause provides that "Congress shall make

no law . . . abridging the freedom of speech."  The New York Constitution (Art. I, § 8) similarly

guarantees "Freedom of speech" and mandates that "no law shall be passed to restrain or abridge

the liberty of speech."  The Supreme Court has recognized that "freedom of speech prohibits the

government from telling people what they must say."  *Rumsfeld v. Forum for Acad. &

Institutional Rights, Inc.*, 547 U.S. 47, 61 (2006).  Where a law compels speech that is

noncommercial in nature, that law is assessed under the Supreme Court's strict scrutiny rubric.

64.     CEEFPA has deprived and will continue to deprive Plaintiffs of their First

Amendment free speech rights.

65.     CEEFPA requires property owners, including Plaintiffs, to provide a Hardship

Declaration to their tenants—using language mandated by the government—with every demand

for rent, commencement of eviction proceeding, or petition.  That Hardship Declaration includes

a Declaration Form, which provides check-the-box options for the tenant to assert either that the

tenant is "experiencing financial hardship" and therefore "unable to pay" the rent owed, or that

vacating the premises would pose a "significant health risk."  CEEFPA Part A § 1(4).  If a

tenant's "primary language" is one other than English, "Spanish [or] the six most common

languages in the city of New York," property owners must also obtain appropriate translations of the Declaration Form at their own expense.  *Id.* §§ 3, 10.  By mandating that Plaintiffs supply this form to tenants—and arrange for the translation of the form—CEEFPA compels Plaintiffs to endorse and adopt these government statements as their own, even though they may disagree with the Form's characterization of tenants' financial hardship, ability to pay, or health risks, and even though they disagree with the resulting eviction moratorium.  As a result, Plaintiffs "must represent as [their] own an opinion . . . that [they] might not categorically hold."  *All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 218, 237 (2d Cir. 2011), *aff'd sub nom. Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013).

66.     In addition, CEEFPA requires Plaintiffs to provide tenants with a "list" prepared by the Office of Court Administration "of all not-for-profit legal service providers actively handling housing matters in the county where the subject premises are located."  This requirement compels Plaintiffs to endorse the State's selection of legal service providers, including those that may be adverse to Plaintiffs or their interests.  Plaintiffs have no discretion to omit an organization from the list, even if they disapprove of it or its activities.

67.     These pre-eviction Hardship Declaration notices are subject to strict scrutiny, because they constitute noncommercial speech under both of the Supreme Court's definitions of such speech.  *First*, the Declaration Forms do not "propose a commercial transaction."  *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 637 (1985).  Instead, they provide a list of legal service providers, inform tenants of potential legal options that are potentially adverse to the property owners, and make contestable assertions about tenants' alleged financial hardship and health risks.  *Second*, the Hardship Declaration is not "related solely to the economic interests of the speaker and its audience."  *Cent. Hudson Gas & Elec.*

*Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 561 (1980).  The Declaration Form

discloses no information whatsoever about Plaintiffs' properties that might "better inform

consumers about the products they purchase." *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104,

115 (2d Cir. 2001).  Instead, as noted, it makes contestable assertions about *tenants'* alleged

financial hardship and health risks.  Similarly, the list of legal service providers "in no way

relates to the services that [Plaintiffs] provide," *Nat'l Inst. of Family & Life Advocates v.*

*Becerra*, 138 S. Ct. 2361, 2372 (2018), and is therefore unrelated to the economic interests of

Plaintiffs.  *See Baptiste v. Kennealy*, --- F. Supp. 3d ----, 2020 WL 5751572, at *37 (D. Mass.

Sept. 25, 2020) (required landlord disclosure of "services provided by tenant advocacy

organizations" not subject to rational basis review because it "does not relate directly to the

services provided by landlords").

      68.    The Hardship Declaration fails strict scrutiny, because it is not narrowly tailored

to the government's interest of informing tenants about their legal rights.  To that end, there is

clearly a less restrictive means available that does not burden the First Amendment rights of

Plaintiffs:  The State can provide the notices to tenants directly.  Indeed, not only is the

Declaration form currently available on the New York Court's website,

http://www.nycourts.gov/courts/nyc/SSI/images/corona/HardshipDeclaration.pdf, but, on

information and belief, the state's Office of Court Administration has already mailed thousands

of hardship declarations to tenants whose property owners have moved to evict them.  *See* Emma

Whitford, *Major Takeaways From NY's New Anti-Eviction Law*, Law360 (Jan. 8, 2021)

(discussing an upcoming "statewide mass mailing of hardship declarations to all tenants sued in

eviction cases").  Alternatively or additionally, the Government could conduct a public

awareness campaign to ensure that tenants are adequately informed about their options.  The

Government, however, "chose to forego these alternatives in favor of a law that not only compels the Plaintiffs to carry [its] specific message as if it were their own, but also to bear the associated costs of doing so." *PSEG Long Island LLC v. Town of N. Hempstead*, 158 F. Supp. 3d 149, 168 (E.D.N.Y. Feb. 3, 2016).  Thus, CEEFPA violates Plaintiffs' First Amendment rights.  *Baptiste*, 2020 WL 5751572, at *38 (granting landlords preliminary injunction because "requiring plaintiffs to refer tenants to organizations which advocate positions with which plaintiffs disagree, and which oppose the landlords' interests in the political arena and in court" violated First Amendment).

69.     Even if the compelled speech were commercial, however, the pre-eviction Hardship Declarations would fail the more deferential standard of review under *Zauderer*: Because of the ready availability of alternatives, including those presently undertaken by the Government, CEEFPA imposes requirements that are "unjustified or unduly burdensome." *Becerra*, 138 S. Ct. at 2372 (quoting *Zauderer*, 471 U.S. at 651).

70.     Acting under color of state law, Defendant has caused, and will continue to cause, Plaintiffs to be deprived of rights guaranteed to them by the First Amendment to the United States Constitution and its equivalent in the New York State Constitution, both facially and as applied to them.

71.     In the absence of declaratory and injunctive relief, property owners (including Plaintiffs) will continue to be irreparably harmed and to be subjected to this deprivation of rights.

## SECOND CAUSE OF ACTION
**Void for Vagueness – Fourteenth Amendment of the U.S. Constitution and Article I, § 6 of the N.Y. Constitution; 42 U.S.C. § 1983**

72.     Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

73.     The Due Process clause of the Fourteenth Amendment to the United States Constitution provides in part:  "[N]or shall any State deprive any person of life, liberty, or property, without due process of law."  The New York Constitution (Art. I, § 6) similarly directs: "No person shall be deprived of life, liberty or property without due process of law."

74.     A law is unconstitutionally vague under procedural due process principles "if people of common intelligence must guess at its meaning and may differ as to its application" or if it fails "to provide sufficient standards to guide its application."  *Marchi v. Bd. of Coop. Educ. Servs. of Albany*, 173 F.3d 469, 480 (2d Cir. 1999).

75.     Plaintiffs have a legitimate property interest, grounded in state law, in the property they own and in the right to retake possession of that property pursuant to New York's lawful eviction process.

76.     CEEFPA's hardship provision allowing tenants to claim "[s]ignificant loss of household income," "[i]ncrease in necessary out-of-pocket expenses," and "other circumstances related to the COVID-19 pandemic," among other vague and undefined circumstances, violates Plaintiffs' procedural due process rights because it fails to provide them with fair notice of CEEFPA's requirements, is so standardless as to provide for arbitrary and discriminatory enforcement, invites unreviewable abuse by tenants, and deprives them of any procedural opportunity to discern—let alone challenge—the reasoning for Declaration Forms based on these undefined circumstances.

77.     As described in the foregoing allegations, CEEFPA's failure to define phrases including but not limited to "other circumstances," "meaningful employment," "significantly increase," and "significantly reduce" renders the "other circumstances" financial hardship category essentially meaningless, robbing landlord owners (including Plaintiffs) of fair notice of

when a tenant is eligible to avoid eviction.  Tenants' ability to submit a valid Declaration Form without even specifying the "financial hardship" category they believe applies keeps landlords like Plaintiffs in the dark about what precisely they are rebutting.  The lack of any evidentiary obligations for tenants and fair notice to landlords makes the Declaration Forms ripe for abuse. The same is true for the financial hardship categories of "[s]ignificant loss of household income" and "[i]ncrease in necessary out-of-pocket expenses" relating to "essential work" or "related health impacts" during the COVID-19 pandemic, as well as that childcare responsibilities or responsibilities to care for an elderly, disabled, or sick family member during the COVID-19 pandemic have "negatively affected" the tenant's or household member's ability to obtain "meaningful employment" or "earn income" or increased their "necessary out-of-pocket expenses," that "[m]oving expenses and difficulty . . . securing alternative housing make it a hardship . . . to relocate to another residence during the COVID-19 pandemic."  That vacating the premises and moving would "pose a significant health risk" is equally as vague.  None of these terms is defined, and all are hopelessly vague.

78.     Likewise, the contentless nature of these categories will result in arbitrary and discriminatory enforcement, as they provide no standards to guide their application.  The arbitrary nature of the financial hardship categories is compounded by its creation of a rebuttable presumption of financial hardship in proceedings involving a defense under the TSHA, an executive order, or "any other local or state law, order or regulation restricting the eviction of a tenant suffering from a financial hardship during or due to COVID-19," as CEEFPA is silent on how the presumption may be rebutted.  And if property owners make what law enforcement officials decide, in their unfettered discretion, are false statements about the tenant in their signed affidavit to the court seeking to rebut the vague assertions of the Hardship Declaration, property

owners could face perjury charges with up to a $5,000 fine and three to five years of jail time. N.Y. Penal Law § 210, *et. seq.*

79.     Acting under color of state law, Defendant has caused, and will continue to cause, property owners (including Plaintiffs) to be deprived of their property without due process, both facially and as applied to them, in violation of their due process rights under the Fourteenth Amendment.

80.     In the absence of declaratory and injunctive relief, property owners (including Plaintiffs) will continue to be irreparably harmed and to be subjected to this deprivation of rights guaranteed to them by the United States Constitution and the New York State Constitution.

## THIRD CAUSE OF ACTION
### Due Process – Fourteenth Amendment of the U.S. Constitution and Article I, § 6 of the N.Y. Constitution; 42 U.S.C. § 1983

81.     Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

82.     The Due Process clause of the Fourteenth Amendment to the United States Constitution provides in part:  "[N]or shall any State deprive any person of life, liberty, or property, without due process of law."  The New York Constitution (Art. I, § 6) similarly directs: "No person shall be deprived of life, liberty or property without due process of law."

83.     Plaintiffs have a legitimate property interest, grounded in state law, in the property they own and in the right to retake possession of that property pursuant to New York's lawful eviction process.

84.     CEEFPA deprives property owners, including Plaintiffs, of their procedural due process right to "be heard at a meaningful time and in a meaningful manner" with respect to a tenants' Declaration Forms, whether premised on claimed financial hardship or purported health risks associated with relocation.  *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976).  Once a tenant

completes a Declaration Form—which tenants are not required to sign under penalty of perjury (and instead only under "penalty of law," whatever that means)—a pending eviction proceeding is automatically stayed until at least May 1.  Where an eviction warrant has been issued but not yet executed, execution is automatically stayed until at least that date.  And if a property owner has not yet initiated an eviction proceeding, it may not do so during the same period.  This inability to contest or obtain any review of tenants' Declaration Forms deprives Plaintiffs of their procedural due process rights—a violation made particularly severe in light of CEEFPA's vagueness and significant potential for abuse.

85.     Acting under color of state law, Defendant has caused, and will continue to cause, Plaintiffs to be deprived of their property without due process, both facially and as applied to them, in violation of their procedural due process rights under the Fourteenth Amendment.

86.     In the absence of declaratory and injunctive relief, property owners (including Plaintiffs) will continue to be irreparably harmed and to be subjected to this deprivation of rights guaranteed to them by the United States Constitution and the New York State Constitution.

## FOURTH CAUSE OF ACTION
### Right to Petition – First Amendment of the U.S. Constitution and Article I, § 9 of the N.Y. Constitution; 42 U.S.C. § 1983

87.     Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

88.     The Petition clause of the First Amendment of the United State Constitution provides that "Congress shall make no law . . . abridging . . . the right of the people to petition the Government for a redress of grievances."  The New York Constitution (Art. I, § 9) similarly guarantees the "Right to assemble and petition," and mandates that "[n]o law shall be passed abridging the rights of the people . . . to petition the government, or any department thereof."

89.     "[T]he right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances." *Bill Johnson's Rests., Inc. v. N.L.R.B.*, 461 U.S. 731, 741 (1983).

90.     Because CEEFPA completely bars a class of property owners, including Plaintiffs, from exercising their rights to file eviction petitions with New York courts until at least May 1, 2021—specifically, all property owners who have received a completed Declaration Form, after barring *all* property owners from filing eviction petitions through February 26, 2021—it violates their rights under the Petition clause.

91.     Acting under color of state law, Defendant has caused, and will continue to cause, Plaintiffs to be deprived of rights guaranteed to them by the First Amendment to the United States Constitution (as well as its New York state corollary), both facially and as applied to them.

92.     In the absence of declaratory and injunctive relief, property owners (including Plaintiffs) will continue to be irreparably harmed and to be subjected to this deprivation of rights.

## FIFTH CAUSE OF ACTION
### Unconstitutional Judicial Delegation – Article VI, § 30 of the N.Y. Constitution

93.     Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

94.     The New York Constitution provides that the chief administrative judge "shall exercise any such power delegated to him or her with the advice and consent of the administrative board of the courts."  N.Y. Const. art. VI, § 30; *see also* N.Y. Judiciary Law § 212 ("The chief administrator shall also . . . [a]dopt rules and orders regulating practice in the courts as authorized by statute with the advice and consent of the administrative board of the courts, in accordance with the provisions of section thirty of article six of the constitution.").

95.     Accordingly, "[t]he Chief Administrator can exercise legislatively delegated powers to regulate matters of jurisdiction, practice and procedure *only with advice and consent of the Administrative Board*." *Bloom v. Crosson*, 590 N.Y.S.2d 328, 330 (3d Dep't 1992), *aff'd*, 82 N.Y.2d 768 (1993) (emphasis added).

96.     CEEFPA purports to delegate to the chief administrative judge the power to extend the statewide stay of eviction proceedings beyond the initial sixty day period. Specifically, it allows the chief administrative judge to unilaterally extend the stay—with no limit on the length of the extension or extensions—if and to the degree it is "necessary," in his unilateral discretion, "to ensure that courts are prepared to conduct proceedings in compliance with this act and to give tenants an opportunity to submit the [Declaration Forms] pursuant to this act." CEEFPA Part A § 2.

97.     Because CEEFPA does not require the chief administrative judge to first obtain the advice and consent of the Administrative Board, the law contravenes the delegation of power provision in Article VI, § 30 of the New York Constitution .

98.     Acting under color of state law, Defendant has violated, and will continue to violate Article VI, § 30 of the New York Constitution.

99.     In the absence of declaratory and injunctive relief, the New York Constitution will continue to be violated.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment against Defendant as follows:

1)      A declaration that Part A of CEEFPA is facially unconstitutional in its entirety under the First and Fourteenth Amendments to the United States Constitution and under Article I, §§ 6, 8 & 9 of the New York Constitution;

2)      In the alternative, a declaration that each of the challenged portions and

provisions of Part A of CEEFPA are facially unconstitutional under the First and

Fourteenth Amendments to the United States Constitution and under Article I,

§§ 6, 8 & 9 of the New York Constitution;

3)      A declaration that Part A of CEEFPA is unconstitutional in its entirety as applied

to Plaintiffs, or that each of the challenged portions and provisions of Part A of

CEEFPA are unconstitutional as applied to Plaintiffs;

4)      An emergency restraining order and permanent injunction enjoining Defendant

from implementing or enforcing Part A of CEEFPA, or, in the alternative, of

implementing or enforcing each of its challenged portions and provisions, both

facially and as applied to Plaintiffs;

5)      An award of fees, costs, expenses, and disbursements, including attorneys' fees

and costs to which Plaintiffs are entitled pursuant to 42 U.S.C. § 1988; and

6)      Such other and further relief as the Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury in this

action of all issues so triable.

Dated: New York, New York
      February 24, 2021

GIBSON, DUNN & CRUTCHER LLP

By:  /s/ *Randy M. Mastro*

    Randy M. Mastro
    Akiva Shapiro

    200 Park Avenue, 47th Floor
    New York, NY  10166-0193
    Telephone:  (212) 351-4000
    RMastro@gibsondunn.com
    AShapiro@gibsondunn.com

    *Attorneys for Plaintiffs*