**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **PANTELIS CHRYSAFIS, BETTY COHEN, BRANDIE LACASSE, MUDAN SHI, and FENG ZHOU,** <br><br> **Plaintiffs,** <br><br> **v.** <br><br> **LETITIA JAMES, in her official capacity as Attorney General of the State of New York,** <br><br> **Defendant.** | Case No. 21-cv-00998 (SJF-ARL) |

**BRIEF OF *AMICI CURIAE***
**HOUSING COURT ANSWERS AND MAKE THE ROAD NEW YORK**

LEGAL SERVICES NYC
Edward Josephson, Director of Litigation
Roland Nimis, of counsel
40 Worth Street, Suite 606
New York, NY 10013
Tel: (646) 442-3600
ejosephson@lsnyc.org

THE LEGAL AID SOCIETY
Judith Goldiner, Esq., Attorney in Charge,
Civil Law Reform Unit
Ellen Davidson, of counsel
Amber Marshall, of counsel
199 Water Street
New York, NY 10038
Tel: 212-577-3332
jgoldiner@legal-aid.org

*Attorneys for Housing Court Answers and
Make the Road New York*

# TABLE OF CONTENTS

STATEMENT OF INTEREST OF AMICI CURIAE ................................................................ 1

PRELIMINARY STATEMENT ........................................................................................ 2

ARGUMENT ................................................................................................................ 3

I.    The COVID-19 Pandemic Has Created a Health and Affordability Crisis Among New York Tenants ................................................................................................. 3

II.   The Resumption of Evictions for Tenants Facing a Hardship Due to COVID-19 Would Create a Homelessness Crisis ........................................................................ 6

III.  The Court System is not Capable of Adjudicating All Possible Eviction Cases During the Ongoing Public Health Emergency ..................................................................... 7

IV.  New York State Has Received Money for Rent Relief and Will be Soon Awarding Tenants and Landlords Over a Billion Dollars to Address Back Rent Obligations .......... 10

V.   CEEFPA Regulates the Conduct of Eviction Proceedings and Any Effect on Petitioner's Speech is Incidental ....................................................................................... 11

VI.  CEEFPA DOES NOT VIOLATE PLAINTIFFS' DUE PROCESS RIGHTS ................ 16

      A.  CEEFPA is Not Unconstitutionally Vague ............................................... 16

      B.  CEEFPA Does Not Deprive Plaintiffs of the Opportunity to be Heard on Their Claims .......................................................................................... 17

VII.  CEEFPA DOES NOT DEPRIVE PLAINTIFFS OF THEIR RIGHT TO PETITION .... 18

VIII. THE BALANCE OF THE EQUITIES FAVORS THE STATE'S INTEREST IN PROTECTING THE PUBLIC HEALTH IN THE MIDST OF A GLOBAL PANDEMIC ................................................................................................................. 21

CONCLUSION ............................................................................................................. 23

## TABLE OF AUTHORITIES

**Cases**

*Able v. United States*, 44 F.3d 128 (2d Cir. 1995) ........................................................................ 21

*Apartment Assoc. of Los Angeles County, Inc. v. City of Los Angeles*, 20-CV-05193, 2020 WL 6700568 (C.D. Cal. 2020) ........................................................................... 23

*Auracle Homes, LLC v. Lamont*, No. 3:20-CV-00829, 2020 WL 4558682 (D. Conn. 2020) ...... 23

*Baptiste v. Kennealy*, No. 1:20-CV-11335-MLW, 2020 WL 5751572 (D. Mass. Sept. 25, 2020) ................................................................................................................................... 13, 15, 20

*Brown v. Azar*, No. 1:20-CV-03702-JPB, 2020 WL 6364310 (N.D. Ga. 2020) ................... 20, 22

*Chambless Enterprises, LLC v. Redfield*, 3:20-CV-01455, 2020 WL 7588849 (W.D. La 2020) 22

*Christopher v. Harbury*, 536 U.S. 402 (2002) ................................................................. 19

*City of New York v. Beretta U.S.A. Corp.*, 425 F.3d 384 (2d Cir. 2008) ..................................... 19

*Elmsford Apartment Assocs., LLC V. Cuomo*, 469 F.Supp.3d 148, 173 (S.D.N.Y. 2020)18, 19, 20

*HAPCO v. City of Philadelphia*, 482 F.Supp.3d 337 (E.D. Pa. 2020) ......................................... 23

*Heights Apartments, LLC v.Walz*, No. 20-CV-2051 (NEB/BRT) 2020 WL 7828818 (D. Minn., 2020) ...................................................................................................................... 20

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 115 S. Ct. 2338, 132 L. Ed 2d 487 (1995) ............................................................................................... 12

*Inmates of Suffolk Cty. Jail v. Rouse*, 129 F.3d 649 (1st Cir. 1997) ........................................... 19

*Lynch v. City of New York*, 589 F.3d 94 (2d Cir. 2009) ............................................................. 21

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ................................................................................ 18

*Medical Soc'y of State of New York v. Toia*, 560 F.2d 535 (2d Cir. 1977) ................................. 22

*Plaza Health Laboratories, Inc. v. Perales*, 878 F.2d 577 (2d Cir. 1989) ................................. 21

*Rubin v. Garvin*, 544 F.3d 461 (2d Cir. 2008) ........................................................................... 17

*Rumsfeld v. Forum for Acad. & Institutional Rights., Inc.*, 547 U.S. 47, 126 S. Ct. 1297, 164 L. Ed. 2d 156 (2006) ...................................................................................................... 11, 12

*Sorrell v. IMS Health Inc.*, 564 U.S. 552, 131 S. Ct. 2653, 180 L. Ed. 544 (2011) .................... 11

*Tiger Lily LLC v. U.S. Dep't of Hous. and Urban Dev.*, 2020 WL 7658126 (W.D. Tenn. 2020) 23

*VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179 (2d Cir. 2010) ........................................... 17

*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985) ................................ 12, 14

**Statutes**

22 NYCRR § 208.42 ............................................................................................................... 15

CEEFPA § 1 ............................................................................................................................ 21

CEEFPA § 3 ...................................................................................................................... 13, 16

CEEFPA § 4 ...................................................................................................................... 16, 21

CEEFPA § 5 ............................................................................................................................ 16

CEEFPA §9 ............................................................................................................................. 18

Consolidated Appropriations Act, 2021, Pub. L. No. 116-260 (Dec. 27, 2020) ......................... 10

N.Y. Emergency Tenant Protection Act (McKinney's Uncons. Laws of N.Y.) § 8625 .............. 17

N.Y. Rent Stabilization Law (N.Y.C. Admin. Code) § 26-511 ................................................... 17

N.Y.C. Rent Stabilization Code (9 N.Y.C.R.R.) § 2523.4 ......................................................... 17

**Other Authorities**

*About Section 8*, New York City, https://www1.nyc.gov/site/hpd
    /services-and-information/about-section-8.page (last visited Mar. 9, 2021) ............................. 8

*American Rescue Plan Act*, Nat'l Low Income Hous. Coal., (Mar. 2021),
    https://nlihc.org/sites/default/files/COVID-Relief-Budget_Reconciliation.pdf ..................... 10

AO/78/20, N.Y. State Courts, https://www.nycourts.gov/whatsnew/pdf/AO-78-2020
    .pdf ................................................................................................................................... 8

Apoorva Mandavilli, *A New Coronavirus Variant Is Spreading In New York, Researchers
    Report*, N.Y. Times (updated Mar. 3, 2021),
    https://www.nytimes.com/2021/02/24/health/coronavirus-variant-nyc.html ........................... 5

Cameron Huddleston, *Survey: 69% of Americans Have Less Than $1,000 in Savings*, GOBankingRates (December 16, 2019), https://www.gobankingrates.com/saving-money/savings-advice/americans-have-less-than-1000-in-savings/ ........................................... 7

Carolyn Y. Johnson, *Scientists Underestimated the Coronavirus – and Are Racing to Keep Up with Evolution*, WASHINGTON POST (Mar. 7, 2021), https://www.washingtonpost.com/health/2021/03/07/scientists-underestimated-coronavirus-are-racing-keep-up-with-evolution ............................................................................. 5

Cary P. Gross, et al., *Racial and Ethnic Disparities in Population Level Covid-19 Mortality*, MEDRXIV (May 7, 2020), https://doi.org/10.1101/2020.05.07.20094250 .................................. 4

*City Agency Service Updates,* New York City, https://www1.nyc.gov/nyc-resources/city-agency-service-updates.page (last visited June 15, 2020) (code inspections in NYC limited to heat, hot water, and other dire conditions) ............................................................... 8

*Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited March 8, 2021) ................................................................................................................. 3

*COVID-19 Dashboard by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins University (JHU)*, https://coronavirus.jhu.edu/map.html (last visited March 8, 2021) 3

*COVID-19 Outbreak—New York City, February 29-June 1, 2020*, Ctrs. for Disease Control and Prevention (November 20, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6946a2-H.pdf ........................................ 4

*COVID-19 Vaccines*, Food and Drug Admin. (updated March 3, 2021), https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/covid-19-vaccines ................................................................................................... 5

Ctr. for Budget and Policy Priorities, *New York Federal Rental Assistance Fact Sheet* (Dec. 10, 2019), https://www.cbpp.org/research/housing/federal-rental-assistance-fact-sheets#NY ........ 6

Emma Whitford, *New NYC Eviction Cases Start to Move As State Teases Action*, LAW360 (Dec. 23, 2020), https://www.law360.com/articles/1340413/new-nyc-eviction-cases-start-to-move-as-state-teases-action ................................................................................................. 9

*Evictions*, N.Y. City Council, https://council.nyc.gov/data/evictions/ (last visited Mar. 9, 2021). 7

Fiscal Policy Inst., *Nearly Half of New York Renting Families are Rent Burdened*, (Apr. 2019), available at http://fiscalpolicy.org/wp-content/uploads/2019/04/NYS-RentBurdens_Apr2019_MAIN-3.pdf ......................................................................... 7

*Guidance on Executive Order 202.6*, https://esd.ny.gov/guidance-executive-order-2026 ............. 8

iv

*Homelessness Prevention*, New York City, https://www1.nyc.gov/site/hra/help/homebase.page (last visited Mar. 9, 2021) ........................................................................................... 8

Hye Jin Rho, et al., *A Basic Demographic Profile of Workers in Frontline Industries*, Ctr. for Econ. and Policy Research (Apr. 2020), https://cepr.net/wp-content/uploads/2020/04/2020-04-Frontline-Workers.pdf ............................................................................................... 5

Janet DiFiore, Chief Judge, *State of Our Judiciary, 2021*, at 3 (Mar. 2, 2021), https://www.nycourts.gov/whatsnew/pdf/21_SOJ-Speech.pdf ................................................ 8

Michael Schwirtz & Lindsey Rogers Cook, *These N.Y.C. Neighborhoods Have the Highest Rates of Virus Deaths*, N.Y. TIMES (May 18, 2020), https://www.nytimes.com/2020/05/18/nyregion/coronavirus-deaths-nyc.html ........................ 4

Mihir Zaveri, *New ZIP Code Data Reflects Disparities in N.Y.C's Vaccination Effort, Officials Say*, N.Y. TIMES (Feb. 16, 2021), https://www.nytimes.com/2021/02/16/nyregion/nyc-covid-vaccine-zip-codes.html ......................................................................................... 5, 6

N.Y. State Senate, Reg. Sess., at 3091–92, ll. 1, 25 (Dec. 28, 2020), https://www.nysenate.gov/transcripts/floor-2020-12-28t131100 ........................................... 10

*Number of Unemployment Insurance Beneficiaries and Benefits Amount Paid – December 2019*, N.Y. State Dep't of Labor, https://labor.ny.gov/stats/UI/Beneficiaries-and-Amounts-by-Region-and-County-December-2019.pdf .................................................................... 4

*Number of Unemployment Insurance Beneficiaries and Benefits Amount Paid – December 2020*, N.Y. State Dep't of Labor, https://labor.ny.gov/stats/UI/Beneficiaries-and-Amounts-by-Region-and-County-December-2020.pdf .................................................................. 3, 4

*Number of Unemployment Insurance Beneficiaries and Benefits Amount Paid – January 2021*, N.Y. State Dep't of Labor, https://labor.ny.gov/stats/UI/Beneficiaries-and-Amounts-by-Region-and-County-January-2021.pdf ...................................................................... 4

*Preliminary Estimate of Excess Mortality During the COVID-19 Outbreak — New York City, March 11–May 2, 2020*. Ctrs. for Disease Control and Prevention (May 15, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6919e5.htm ..................................................... 3

*Science Brief – Emerging SARS-CoV-2 Variants*, Ctrs. for Disease Control and Prevention (updated Jan. 28, 2021), https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/scientific-brief-emerging-variants.html ........................................................................ 5

Scott Stringer, Census and the City: Overcoming NYC's Digital Divide in the 2020 Census, Office of the New York City Comptroller (July 2019), at 5. https://comptroller.nyc.gov/wp-content/uploads/documents/Census_and_The_City_Overcoming_NYC_Digital_Divide_Census.pdf............................................................................................................ 9

Shelly Nortz, *Testimony on the Disparate Impact of COVID-19 on Homeless People in New York City before the NYS Legislature*, Coal. for the Homeless (May 18, 2020), https://www.coalitionforthehomeless.org/wp-content/uploads/2020/05/COVID-19TestimonyMay182020.pdf ................................................................................................ 7

Tamaz Cajner, et al., *The U.S. Labor Market During the Beginning of the Pandemic Recession*, Nat'l Bureau of Econ. Research, https://www.nber.org/papers/w27159.pdf ........................... 5

Testimony of Commissioner Mike Heim of the New York State Office of Temporary and Disability Assistance, February 9, 2021 before Legislative Fiscal Committees' Joint Budget Hearing, at 2 (Feb. 9, 2021), https://www.nysenate.gov/sites/default/files/office_of_temporary_and_disability_assistance.21.pdf ...................................................................................................................................... 10

*The 2019 Annual Homeless Assessment Report (AHAR) to Congress*, U.S. Dep't of Hous. and Urban Dev., (Jan. 2020), https://www.hudexchange.info/resource/5948/2019-ahar-part-1-pit-estimates-of-homelessness-in-the-us/-AHAR-Part-1.pdf ......................................................... 7

*Vaccine Demographic Data – Race & Ethnicity*, New York State Dep't of Health, https://covid19vaccine.health.ny.gov/vaccine-demographic-data (last visited Mar. 8, 2021) ... 6

<u>**STATEMENT OF INTEREST OF AMICI CURIAE**</u>

*Amici curiae* are non-profit organizations that represent low-income tenants throughout the state of New York who would be at imminent risk of eviction if the provisions of the COVID-19 Emergency Eviction and Foreclosure Prevention Act of 2020 ("CEEFPA") challenged by Plaintiffs were found to be unconstitutional. *Amici* have a special interest and substantial expertise regarding evictions and low-income tenants in New York.

**Housing Court Answers ("HCA")** was founded in 1981 to provide legal information to *pro se* litigants in New York City's Housing Courts. HCA staffs tables at all of New York City's Housing Courts, providing information, answers to questions and advice to unrepresented litigants. Additionally, HCA operates a Hotline to explain housing court procedures to *pro se* litigants and to provide information about rent arrears assistance.

**Make The Road New York ("MTRNY")** is a non-profit community-based membership organization, in existence for 20 years, with over 24,000 low-income members dedicated to building the power of immigrant and working class communities to achieve dignity and justice through organizing, policy innovation, transformative education, and survival services. MTRNY operates five community centers in the state of New York: in Brooklyn, Queens, Staten Island, Suffolk County, and Westchester County. MTRNY members and organizers are at the forefront of campaigns at the city and state level to fight for inclusionary housing policies, housing affordability and to prevent displacement of families from their communities.

MTRNY's survival services teams—which include legal, health, and adult education—serve tens of thousands of New Yorkers each year. Specifically, the legal team represents thousands of clients in various matters each year, for cases ranging from immigration to housing to employment. Importantly, they represent hundreds of tenants each year to prevent eviction, stop

landlord harassment and discrimination, and ensure safe and habitable living conditions, and assist numerous mixed-status immigrant families in accessing and preserving rental assistance. Both the legal team and organizers educate tenants on their rights, which in turn empowers tenants to advocate on their own behalf. Since the beginning of the pandemic, MTRNY's services have continued uninterrupted, and a large majority of MTRNY's members have lost their jobs and have fallen behind in rent.

## PRELIMINARY STATEMENT

47,857 New Yorkers have died from COVID-19. This fact is not mentioned in Plaintiffs' moving papers, in which they ask this court to enjoin the commonsense emergency measures enacted by the Legislature to prevent the deaths of many more residents of our state. Nor do Plaintiffs mention the more than 2 million New Yorkers thrown out of work by the pandemic, many of whom can no longer afford to pay their rent, and but for the moratorium challenged by Plaintiffs, would aggravate the state's health crisis by crowding into homeless shelters or the homes of others.

Instead, Plaintiffs elevate their own temporary financial distress above the medical and financial hardship faced by 19 million other New Yorkers, and ask this court to second-guess the judgments of the state's elected leadership who are trying to balance and accommodate the needs of all the state's residents in the middle of a global pandemic.

As set forth below, courts in New York and across the country have rejected Plaintiffs' arguments that a temporary moratorium on eviction filings constitutes either a denial of due process or a violation of the right to petition the government. Nor are Plaintiffs' constitutional rights violated by commonplace statutory pleading requirements, or the statute's inclusion of widely-used terms like "significant" and "substantial." More importantly, New York's need to

control the COVID-19 pandemic far outweighs Plaintiffs' temporary economic distress in any rational balancing of the equities. *Amici* therefore urge this court to deny Plaintiffs' Motion for a Preliminary Injunction.

**ARGUMENT**

## I.     The COVID-19 Pandemic Has Created a Health and Affordability Crisis Among New York Tenants

This case comes before the court during the ongoing coronavirus disease 2019 (COVID-19) pandemic. As of March 5, 2021, more than 117 million cases of COVID-19 have been reported in 219 countries and territories, resulting in more than 2.59 million deaths.[1] A year into the pandemic, New York is one of the hardest hit states in the United Sates with 47,857 deaths, second only to California.[2] New York City alone accounts for 29,823 of the deaths in New York.[3] The actual death toll of COVID-19 is likely even higher. COVID-19 confirmed and probable deaths accounted for only 78% of the seasonally adjusted excess deaths through May 2, leaving 5,293 excess deaths in New York City not officially attributed to COVID-19.[4]

In addition to the heavy death toll, COVID-19 has resulted in an unprecedented loss of employment as non-essential businesses have shut down or reduced in-person operations to avoid spreading the disease and to comply with New York Executive Order 202.8 and federal guidance. In 2020, the over 2.4 million New Yorkers received unemployment benefits[5] as compared to the

---

[1] *COVID-19 Dashboard by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins University (JHU)*, https://coronavirus.jhu.edu/map.html (last visited March 8, 2021).

[2] *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited March 8, 2021).

[3] *New York Coronavirus Map and Case Count*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us /new-york-coronavirus-cases.html#county (last visited March 8, 2021).

[4] *Preliminary Estimate of Excess Mortality During the COVID-19 Outbreak — New York City, March 11–May 2, 2020*. Ctrs. for Disease Control and Prevention (May 15, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6919e5.htm.

[5] *Number of Unemployment Insurance Beneficiaries and Benefits Amount Paid – December 2020*, N.Y. State Dep't of Labor, https://labor.ny.gov/stats/UI/Beneficiaries-and-Amounts-by-Region-and-County-December-2020.pdf.

485,000 recipients in 2019.[6] New York City, the Hudson Valley, and Long Island have been hit especially hard. These regions accounted for 1.1 million, 216,000 and 323,300 of the total 2020 claims respectively.[7] While the economy now is on a path toward recovery, the crisis is not yet over. In January 2021, there were still more active unemployment recipients than all of 2019 with 513,000 New Yorkers continuing to receive benefits.[8]

The staggering unemployment insurance claim numbers do not capture the full extent of the financial hardship caused by COVID-19, because they exclude workers who have lost work but do not qualify for unemployment, including people without sufficient prior earnings or work history, undocumented immigrants, and those whose hours have been cut but who still work part-time.

COVID-19's health and economic toll has disproportionately affected low-income tenants. In New York City, neighborhoods with the highest concentrations of low-income residents and Black and Latinx people have suffered the highest death rates.[9] In New York State, the age-adjusted death rate for Black people is estimated to be 4.30 times the rate of White people and the mortality rate of Latinx is 3.98 times that of Whites.[10] Low-income workers have also faced higher job losses during the pandemic. In the first month of the pandemic, employment for workers in the bottom quintile dropped 35% as compared to a 9% drop in employment for the highest quintile of

---

[6] *Number of Unemployment Insurance Beneficiaries and Benefits Amount Paid – December 2019*, N.Y. State Dep't of Labor, https://labor.ny.gov/stats/UI/Beneficiaries-and-Amounts-by-Region-and-County-December-2019.pdf.

[7] *Number of Unemployment Insurance Beneficiaries and Benefits Amount Paid – December 2020*, N.Y. State Dep't of Labor, https://labor.ny.gov/stats/UI/Beneficiaries-and-Amounts-by-Region-and-County-December-2020.pdf.

[8] *Number of Unemployment Insurance Beneficiaries and Benefits Amount Paid – January 2021*, N.Y. State Dep't of Labor, https://labor.ny.gov/stats/UI/Beneficiaries-and-Amounts-by-Region-and-County-January-2021.pdf.

[9] *COVID-19 Outbreak—New York City, February 29-June 1, 2020*, Ctrs. for Disease Control and Prevention (November 20, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6946a2-H.pdf; *see also* Michael Schwirtz & Lindsey Rogers Cook, *These N.Y.C. Neighborhoods Have the Highest Rates of Virus Deaths*, N.Y. TIMES (May 18, 2020), https://www.nytimes.com/2020/05/18/nyregion/coronavirus-deaths-nyc.html.

[10] Cary P. Gross, et al., *Racial and Ethnic Disparities in Population Level Covid-19 Mortality*, MEDRXIV (May 7, 2020), https://doi.org/10.1101/2020.05.07.20094250.

earners.[11] At the same time, low-income workers and people of color work disproportionately in frontline industries where they are considered essential and therefore at greater risk of being exposed to COVID-19.[12]

Uncertainty continues to loom as multiple variants of the coronavirus emerged in the fall of 2020 and are now circulating globally even as three vaccinations against the original coronavirus have been approved for emergency use within the United States.[13] The new variants are associated with increased transmissibility, resistance to antibody treatment, and re-infection potential.[14] By the end of March 2021, the British variant, known for its more efficient and rapid transmission, is expected to be the most prevalent form of the coronavirus in the United States.[15] In February 2021, researchers also identified a new variant spreading in New York City and Westchester leading to higher rates of hospitalization.[16] Early research demonstrates that the approved vaccinations may have reduced effectiveness against some variants and may need frequent updating like the influenza vaccine.[17]

Furthermore, efforts to vaccinate have disproportionally benefited wealthy, white people even as low-income communities of color remain the hardest hit.[18] In every region of New York

---

[11] Tamaz Cajner, et al., *The U.S. Labor Market During the Beginning of the Pandemic Recession*, Nat'l Bureau of Econ. Research, https://www.nber.org/papers/w27159.pdf.
[12] Hye Jin Rho, et al., *A Basic Demographic Profile of Workers in Frontline Industries*, Ctr. for Econ. and Policy Research (Apr. 2020), https://cepr.net/wp-content/uploads/2020/04/2020-04-Frontline-Workers.pdf.
[13] *Science Brief – Emerging SARS-CoV-2 Variants*, Ctrs. for Disease Control and Prevention (updated Jan. 28, 2021), https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/scientific-brief-emerging-variants.html; *see also COVID-19 Vaccines*, Food and Drug Admin. (updated March 3, 2021), https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/covid-19-vaccines.
[14] *Id.*
[15] Apoorva Mandavilli, *A New Coronavirus Variant Is Spreading In New York, Researchers Report*, N.Y. TIMES (updated Mar. 3, 2021), https://www.nytimes.com/2021/02/24/health/coronavirus-variant-nyc.html.
[16] *Id*.
[17] Carolyn Y. Johnson, *Scientists Underestimated the Coronavirus – and Are Racing to Keep Up with Evolution*, WASHINGTON POST (Mar. 7, 2021), https://www.washingtonpost.com/health/2021/03/07/scientists-underestimated-coronavirus-are-racing-keep-up-with-evolution/.
[18] Mihir Zaveri, *New ZIP Code Data Reflects Disparities in N.Y.C's Vaccination Effort, Officials Say*, N.Y. TIMES (Feb. 16, 2021), https://www.nytimes.com/2021/02/16/nyregion/nyc-covid-vaccine-zip-codes.html.

State, white people have been vaccinated at a higher rate than expected based on their eligible population.[19] However, Black people have been vaccinated at only 53 percent of expected rate based on population and Latinx people at 58 percent of the expected rate in most regions.[20]

## II.    The Resumption of Evictions for Tenants Facing a Hardship Due to COVID-19 Would Create a Homelessness Crisis

The ongoing COVID-19 pandemic has fundamentally shifted the economic conditions for New York tenants. The continuing shutdown of economic activity throughout New York, which is necessary to contain the spread of COVID-19, makes it impossible for many tenants to afford rent. These exceptional circumstances make temporary limitations on evictions warranted and necessary. Despite the public health emergency and attendant financial crisis, Plaintiffs argue the Constitution proscribes temporary and tailored modifications to summary eviction proceedings. Instead, if the challenged statute was struck down and evictions were allowed to continue without limitation prematurely, the consequences for tenants would be dire. A resumption of evictions would require tenants to make impossible choices between their health (and the community's health) and their homes. Thus, the modest limitations and modifications on eviction proceedings proceeding contained in CEEFPA are entirely appropriate responses to the COVID-19 emergency.

Before COVID-19, New York already had an affordability crisis for New York tenants. Forty-six percent of New York State renters are rent burdened, and four out of ten low-income people in New York are either homeless or severely rent burdened.[21] 2,034,100 New Yorkers in 940,300 low-income households pay more than 50 percent of their incomes towards their rents.[22]

---

[19] *Id.*
[20] *Vaccine Demographic Data – Race & Ethnicity*, New York State Dep't of Health, https://covid19vaccine.health.ny.gov/vaccine-demographic-data (last visited Mar. 8, 2021).
[21] Ctr. for Budget and Policy Priorities, *New York Federal Rental Assistance Fact Sheet* (Dec. 10, 2019), https://www.cbpp.org/research/housing/federal-rental-assistance-fact-sheets#NY.
[22] *Id.*

Black, Latinx, and Asian households were disproportionately rent burdened before the pandemic.[23] Most low-income tenants do not earn enough to have any significant savings.[24] Many of these tenants fall behind; in New York City in 2017, 230,000 eviction petitions were filed and more than 20,000 families were formally evicted by a city marshal.[25] Some tenants are able to find alternative housing, but many are not. New York State has the highest per capita rate of people who are homeless. In January 2019, there were 92,091 people in homeless shelters or part of the count of unsheltered homeless.[26]

Given the base level instability of housing in New York and the COVID-19-induced economic suppression, New York tenants would face mass evictions if nonpayment proceedings and evictions were allowed to resume without limitation. If evictions resumed, tenants would be forced to risk their health and risk further spread of COVID-19 by returning prematurely to work, if such work is available. The current combination of unemployment benefits and an eviction moratorium allows low-income tenants to focus on following public health mandates without fearing they will fall into homelessness. If tenants are forced to double-up with relatives, enter the shelter system, or sleep on the street, more people will die and the virus will continue to spread.[27]

III.    The Court System is not Capable of Adjudicating All Possible Eviction Cases During the Ongoing Public Health Emergency

---

[23] Fiscal Policy Inst., *Nearly Half of New York Renting Families are Rent Burdened*, (Apr. 2019), available at http://fiscalpolicy.org/wp-content/uploads/2019/04/NYS-RentBurdens_Apr2019_MAIN-3.pdf.

[24] Cameron Huddleston, *Survey: 69% of Americans Have Less Than $1,000 in Savings*, GOBANKINGRATES (Dec. 16, 2019), https://www.gobankingrates.com/saving-money/savings-advice/americans-have-less-than-1000-in-savings/

[25] *Evictions*, N.Y. City Council, https://council.nyc.gov/data/evictions/ (last visited Mar. 9, 2021) (not including tenants who leave their apartments voluntarily before a formal eviction).

[26] *The 2019 Annual Homeless Assessment Report (AHAR) to Congress*, U.S. Dep't of Hous. and Urban Dev., (Jan. 2020), https://www.hudexchange.info/resource/5948/2019-ahar-part-1-pit-estimates-of-homelessness-in-the-us/-AHAR-Part-1.pdf.

[27] *See* Shelly Nortz, *Testimony on the Disparate Impact of COVID-19 on Homeless People in New York City before the NYS Legislature*, Coal. for the Homeless (May 18, 2020), https://www.coalitionforthehomeless.org/wp-content/uploads/2020/05/COVID-19TestimonyMay182020.pdf (age-adjusted mortality rate of homeless residents in NYC shelters is 56% higher than rate for other New York City residents).

Throughout the state, Housing Courts, attorney offices, building management offices, code enforcement agencies, and other actors who are generally involved in eviction litigation have been physically closed during the pandemic and have had limited operations.[28] Courts throughout the state are currently closed to in-person proceedings.[29] The COVID-19 pandemic has also put extreme stress on New York institutions that low-income tenants rely on to maintain economic and housing stability. Like many businesses, government departments throughout the state, including local departments of Social Services, have had to close their physical offices and set up limited remote services.[30] The New York City Human Resources Administration, for instance, has closed almost all local Job Centers where tenants could previously go to open cases for public assistance, emergency rental assistance, SNAP benefits, and rent subsidies. Likewise, public housing authorities, which administer Section 8 benefits, and Homebase operators, which connect tenants to social services and rental assistance, have been physically closed to the public since March.[31]

Due to social distancing requirements, courts which hear eviction cases will not be able to operate in-person in the near term and will instead continue to schedule virtual court appearances and accept most papers through e-filing, which was expanded in response to the pandemic. Indeed, currently, the majority of the Court's business is being conducted virtually.[32] While transforming

---

[28] *See* AO/78/20, N.Y. State Courts, https://www.nycourts.gov/whatsnew/pdf/AO-78-2020
.pdf (limiting Housing Court operations to emergencies); *Guidance on Executive Order 202.6*,
https://esd.ny.gov/guidance-executive-order-2026 (essential business definition generally excludes attorneys and building management) (last visited June 17, 2020; *City Agency Service Updates,* New York City,
https://www1.nyc.gov/nyc-resources/city-agency-service-updates.page (last visited June 15, 2020) (code inspections in NYC limited to heat, hot water, and other dire conditions).
[29] Janet DiFiore, Chief Judge, *State of Our Judiciary, 2021*, at 3 (Mar. 2, 2021),
https://www.nycourts.gov/whatsnew/pdf/21_SOJ-Speech.pdf.
[30] *See City Agency Services Updates*, *supra* note 28.
[31] *Homelessness Prevention*, New York City, https://www1.nyc.gov/site/hra/help/homebase.page (last visited Mar. 9, 2021); *About Section 8*, New York City, https://www1.nyc.gov/site/hpd
/services-and-information/about-section-8.page (last visited Mar. 9, 2021).
[32] Janet DiFiore, Chief Judge, *supra* note 29, at 3.

the New York Court system into a virtual court was a necessary response to the COVID health crisis, low-income New Yorkers lack access to the requisite technology necessary to meaningfully participate in virtually eviction proceedings. New York City's Internet Master Plan found that low-income New Yorkers who lacked a home or mobile broadband connection also face barriers in accessing government services, such as courts.[33] Unfortunately, as of March 2020, about 30 percent, or 2.2 million, of New York City residents lack broadband internet access, including 350,000 who only access internet through cell phones or tablets.[34] Pro se litigants lacking internet access are unable to effectively utilize the New York State Courts Electronic Filing System ("NYSCEF") or participate in teleconferences and are therefore limited in their ability to defend themselves in court. For tenants with limited English proficiency, navigating this virtual court system is even more challenging. Because it is more difficult to defend and resolve eviction proceedings under current pandemic-related circumstances, CEEFPA's exclusion of proceedings against COVID-19-impacted tenants is rational and warranted by the current health crisis.

While the Court's new virtual existence may be working for cases where both parties are represented, cases involving pro se litigants are another story. In New York City, between June 22nd when the courts reopened and the middle of December, less than half of the tenants sued for nonpayment of rent were able to answer their petitions so that they could appear in court to offer defenses to the proceedings.[35] Many tenants are unrepresented by counsel and will not have the technical capability to appear or file papers virtually. Connecting tenants with attorneys is more

[33] The New York City Internet Master Plan, New York City Mayor's Office of the Chief Technology Officer (January 2020) https://tech.cityofnewyork.us/wp-content/uploads/2020/01/ NYC_IMP_1.7.20_FINAL-2.pdf.
[34] Scott Stringer, Census and the City: Overcoming NYC's Digital Divide in the 2020 Census, Office of the New York City Comptroller (July 2019), at 5. https://comptroller.nyc.gov/wp-content/uploads/documents/Census_and_The_City_Overcoming_NYC_Digital_Divide_Census.pdf.
[35] Emma Whitford, *New NYC Eviction Cases Start to Move As State Teases Action*, LAW360 (Dec. 23, 2020), https://www.law360.com/articles/1340413/new-nyc-eviction-cases-start-to-move-as-state-teases-action.

important than ever in an environment where tenants may not have the ability to appear in a remote hearing. CEEFPA's requirement that tenants receive notice of legal service providers addresses this concern.

## IV. New York State Has Received Money for Rent Relief and Will be Soon Awarding Tenants and Landlords Over a Billion Dollars to Address Back Rent Obligations

Directly prior to the passage of CEEFPA, Congress passed, and the President signed into law, the Consolidated Appropriations Act of 2021 which included the Emergency Rental Assistance (ERA) program.[36] Indeed, both sponsors of the bill referred to the federal rent assistance in the context of the passage of CEEFPA.[37] In January, New York State received 1.28 Billion in ERA funds.[38] Governor Cuomo has designated the New York State Office of Temporary and Disability Assistance to run the program to provide rent relief.[39] Currently, it is expected that the program will be enacted as part of the budget due April 1. New York State will soon have additional monies to use for rent relief as Congress included in the American Rescue Plan Act of 2021 an additional 27.4 billion dollars in Emergency Rental Assistance, of which 21.55 billion dollars will be allocated through the Coronavirus Relief Fund which funded ERA.[40] The program parameters will not pay back landlords for rent owed by former tenants. It is only to pay the rent

---

[36] The Emergency Rental Assistance program was established by section 501 of Division N of the Consolidated Appropriations Act, 2021, Pub. L. No. 116-260 (Dec. 27, 2020) (the Act). The bill was passed on December 21 and signed by the President into law on December 27, 2020.

[37] *See* N.Y. State Assembly, at 76 (Dec. 28, 2020) http://nystateassembly.granicus.com/DocumentViewer.php?file=nystateassembly_e860a024f9a21e2a75b1f252a531 4eac.pdf&view=1 (Dinowitz: "we're expecting $1.3 billion from the federal government."); N.Y. State Senate, Reg. Sess., at 3091–92, ll. 1, 25 (Dec. 28, 2020), https://www.nysenate.gov/transcripts/floor-2020-12-28t131100 (Senator Kavanagh: "We estimate that $1.3 billion of federal relief will be coming to New York.").

[38] Emergency Rental Assistance Program, Payments to State and Eligible Units of Local Government, U.S. Treasury Department, https://home.treasury.gov/system/files/136/Emergency-Rental-Assistance-Payments-to-States-and-Eligible-Units-of-Local-Government.pdf.

[39] *See* Testimony of Commissioner Mike Heim of the New York State Office of Temporary and Disability Assistance, February 9, 2021 before Legislative Fiscal Committees' Joint Budget Hearing, at 2 (Feb. 9, 2021), https://www.nysenate.gov/sites/default/files/office_of_temporary_and_disability_assistance.21.pdf.

[40] *American Rescue Plan Act*, NAT'L LOW INCOME HOUS. COAL., (Mar. 2021), https://nlihc.org/sites/default/files/COVID-Relief-Budget_Reconciliation.pdf.

arrears for tenants their current housing. While we do not know New York State's exact allocation

of these new funds, it is possible that New York State will receive another billion dollars to pay

the rent that tenants owe landlords. CEEFPA's moratorium gives everyone, landlords and tenants

time for the federal money to reach tenants.

V.      **CEEFPA Regulates the Conduct of Eviction Proceedings and Any Effect on Petitioner's Speech is Incidental**

Plaintiffs argue that the requirement in Section 3 of CEEFPA that owners must provide a

Hardship Declaration and a list of not-for-profit legal service providers with eviction petitions and

predicate notices is subject to strict scrutiny and constitutes compelled speech in violation of the

First Amendment. Instead, Section 3, like numerous existing laws, simply regulates the contents

of the legal notices required for the commencement of an eviction proceeding. The required notices

contain only factual and uncontroversial information and do not require landlords to endorse any

viewpoint. Section 3 of CEEFPA does not regulate the conduct or speech of landlords outside the

service of eviction petitions and the predicate notices to eviction petitions. CEEFPA's regulation

of the notices required to commence an eviction proceeding during the COVID-19 pandemic is a

regulation of conduct and any restriction of landlords' speech rights is incidental. Accordingly,

Section 3 does not violate Plaintiffs First Amendment rights.

The First Amendment does not prohibit laws directed at conduct from imposing incidental

burdens on speech. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567, 131 S. Ct. 2653, 2664, 180 L.

Ed. 544 (2011). For example, just because a ban on race-based hiring requires an employer to

remove a sign reading "White Applicants Only," it is still analyzed as a regulation of conduct.

*Rumsfeld v. Forum for Acad. & Institutional Rights., Inc.*, 547 U.S. 47, 126, 126 S. Ct. 1297, 1308,

164 L. Ed. 2d 156 (2006). Moreover, regulations of conduct are permissible even if they compel

speech where the government's message can be accommodated without affecting an individual's

own expression. *Rumsfeld*, 547 U.S. 47 at 64. In *Rumsfeld*, the Supreme Court held that a federal law requiring universities to provide equal access to military recruiters did not violate the First Amendment rights of an association of law schools that objected to the military's discriminatory sexual orientation policies. *Id.* The Court held that the law did not violate the schools' First Amendment rights because it primarily regulated conduct—treating military recruiters like other recruiters—that was not inherently expressive. *Id.* The Court reasoned that even though the law would compel speech by requiring law schools to post notices on the military's behalf, the compelled speech was a "far cry" from a government-mandated pledge or motto that the school had to endorse. *Id.* The Court held that the schools' own messages were unaffected by the speech it was forced to accommodate because the recruiting did not sufficiently interfere with any messages of the schools. *Id.* The Court in *Rumsfeld* distinguished the recruiting law from compelled speech violations where the complaining speaker's own message was affected by the speech it was forced to accommodate. *Id.* at 63; *see Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,* 515 U.S. 557, 115 S. Ct. 2338, 132 L. Ed 2d 487 (1995) (requiring parade organizers to include a group imparting a message that the organizers do not wish to convey violated the First Amendment because parades are inherently expressive and including participants carrying a contradictory message would alter the expressive content of the parade). Likewise, the state may require the dissemination of purely factual and uncontroversial information when regulating commercial speech so long as the regulation is reasonably related to a state interest that is not unduly burdensome. *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985).

In the eviction context, a district court, applying *Rumsfeld*, recently held that a prohibition on sending statutory notices to quit during the height of the pandemic did not violate the First Amendment because the law regulated the conduct of serving legal notices for the purpose of

initiating eviction proceedings and the effect on landlords' speech rights was incidental. *Baptiste v. Kennealy*, No. 1:20-CV-11335-MLW, 2020 WL 5751572, at *30 (D. Mass. Sept. 25, 2020).

Section 3 of CEEFPA is undoubtably a regulation of eviction proceedings and any abridgement of landlords' First Amendment rights is incidental. Section 3's requirement that landlords provide the Hardship Declaration and legal service provider list with petitions and predicate notices is instrumental to the fair adjudication of eviction proceedings during the pandemic. CEEFPA was enacted "to avoid as many evictions and foreclosures as possible for people experiencing a financial hardship during the COVID-19 pandemic or who cannot move due to an increased risk of severe illness or death from COVID-19." CEEFPA § 3 (Legislative Intent). In order to identify tenants who are entitled to temporary relief from eviction, CEEFPA created the Hardship Declaration. The Hardship Declaration, signed by tenants under penalty of law, allows eligible tenants to inform their landlords that they are facing a financial hardship or are medically vulnerable. Service of the Hardship Declaration on landlords has the legal effect of delaying commencement of an eviction proceeding until May 1, 2021. The form provided by landlords bears the seal of the seal of the New York Unified Court System and is completed by tenants. Thus, the Hardship Declaration requirement does not compel landlords to speak. It merely requires landlords to include court forms when initiating legal proceedings for eviction.

The only effective means of ensuring that eligible tenants can exercise their rights under CEEFPA is to require that landlords include the Hardship Declaration with eviction petitions and predicate notices. The alternative advanced by Plaintiffs is for the State itself to mail every tenant a Hardship Declaration and conduct a public awareness campaign. Pls.' Mem (ECF No. 6) at 20. While the State has mailed Hardship Declarations to all tenants with recent eviction cases, the only way to ensure that all tenants who are at risk of eviction be aware of and can exercise their rights

under CEEFPA is Section 3. Without Section 3, vulnerable tenants would not be able to forestall their evictions because they lack the knowledge and resources to obtain a Hardship Declaration. If a tenant had not received a Hardship Declaration by mail, they would need to use the Internet and a printer to obtain and print the form. However, many low-income tenants do not have access to technology and putting the burden on tenants would be ineffective for the most vulnerable tenants. Tenants who provided Hardship Declarations that differed from the statutory language would likewise remain vulnerable to eviction. Many eligible tenants who were unaware of CEEFPA would rush to court to answer, needlessly creating a risk of COVID-19 spread. Others would prematurely abandon their apartments and double up with family, creating a further risk of community spread. Section 3 is the only effective way to avoid these harmful consequences. Thus, Section 3 would meet strict scrutiny, even though it should be subjected to intermediate scrutiny at most because it merely requires dissemination of uncontroversial factual information. *See Zauderer*, 471 U.S. 626 at 651.

Likewise, Section 3's requirement that landlords provide a list of legal service providers actively handling eviction cases is designed to regulate the resumption of cases and only incidentally affects landlords' speech rights. As noted above, low-income tenants are dramatically less likely to have sufficient access to and understanding of the technology required to access the courts during the pandemic. Court proceedings are primarily being conducted virtually due to the risk of in-person appearances. In order to meaningfully participate in these proceedings, litigants need to use videoconferencing software with a reliable Internet connection. Thus, connecting tenants with attorneys is necessary if court operations are to resume.

As the government rightly notes, the current mandatory notices of petition for summary nonpayment and holdover proceedings already provide lists of resources for litigants, including

resources for legal help. 22 NYCRR § 208.42(b). Plaintiffs rely on *Baptiste v. Kennealy* to support their First Amendment objection to the provision of a list of legal service providers to tenants. Complaint ¶ 70. However, *Baptiste* distinguished between restrictions on statutory notices that preceded eviction and notices unrelated to eviction proceedings and only found that landlords' First Amendment rights were violated only where the state regulated the content of notices to tenants that were not legal notices predicate to legal proceedings. 2020 WL 5751572, at *33. While *Baptiste* found a requirement that landlords provide referrals to non-legal tenant advocacy groups to be violative of landlords' speech rights, *Baptiste* is non-binding and distinguishable because the regulation at issue compelled speech outside of legal proceedings. Here, CEEFPA does not regulate any speech outside of the required court forms. The forms do not imply that anything about the views of landlords—they merely provide information that effectuates CEEFPA. Moreover, Section 3's legal service provider requirement is more closely related to the government's interest than the required notice in *Baptiste*, because connecting tenants to legal service providers is often the only way that court proceedings will be able to proceed at all. Thus, any compelled speech in the provision of legal service provider lists is incidental.

Section 3 of CEEFPA must be understood in context of the law as a whole, which is regulates summary proceedings during COVID-19. Like the law schools in *Rumsfeld* who objected to the message of military recruiters and who were compelled to post notices on campus notifying students of military recruitment events, Plaintiffs' speech is only incidentally affected by CEEFPA's requirement that they send legal notices prepared by the court to tenants before they are able to commence eviction proceedings. CEEFPA only regulates Plaintiffs' eviction litigation conduct and does not require Plaintiffs to endorse any view advanced by the government. Predicate notices and notices of petition are not inherently expressive. Court forms are necessary in order to

advance the state's interest in the orderly administration of justice. The state has a substantial interest in the regularity and uniformity of pleadings and CEEFPA's Section 3 advances that interest. Section 3 gives practical effect to the purposes of CEEFPA's prevention of unnecessary eviction proceedings and the spread of COVID-19. The requirement that landlords accommodate government forms in their legal pleadings does not limit their ability to express their own views, including their disagreement with CEEFPA, the eviction moratoria, or legal service providers. Thus, Section 3 does not violate Plaintiffs First Amendment rights.

## VI.    CEEFPA DOES NOT VIOLATE PLAINTIFFS' DUE PROCESS RIGHTS

### A.  CEEFPA is Not Unconstitutionally Vague

Plaintiffs wrongly claim that CEEFPA deprives them of Due Process because its language is too vague to provide them with fair notice of CEEFPA's requirements, lacks sufficient standards to guide its application, and ensures that it will be arbitrarily and discriminatorily enforced. Pl. Br. at 21. However, the only "requirements" that CEEFPA imposes on landlords are crystal clear: landlords must serve the required notices and declaration forms upon their tenants (CEEFPA § 3), must refrain from commencing an eviction case if they have received a completed declaration from a tenant (CEEFPA § 4), and, if commencing a proceeding, must attest that it served a blank declaration and did not receive back a completed one (CEEFPA § 5). None of these provisions require either the landlord or the court to interpret any of the terms used in the body of the declaration itself. Contrary to Plaintiffs' contention, the affidavit contemplated by Section 5 of the statute does not provide a vehicle for landlords to contest the veracity of the tenant's declaration. Even if it did, Plaintiffs could not be subject to perjury charges for submitting truthful factual statements about their tenant's financial circumstances.

To the extent Plaintiffs contend that courts will be unable to consistently construe terms such as "meaningful employment," "significantly increase," and "significantly reduce," their concern is misplaced. Statutes regulating economic activity, first of all, "are subject to a relaxed vagueness test" compared to laws with criminal penalties. *Rubin v. Garvin*, 544 F.3d 461, 467 (2d Cir. 2008), *citing, Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982). In *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179 (2d Cir. 2010), moreover, the Second Circuit specifically held that the terms "substantial or significant" were not too "vague" for constitutional application, and cited a plethora of federal statutes employing similar language. *Id.,* at 188 n.7. Indeed, the statutes daily construed in New York's housing courts are replete with comparable terms. *See* N.Y. Rent Stabilization Law (N.Y.C. Admin. Code) § 26-511(c)(9) (eviction protections for disabled tenants who cannot engage in "substantial gainful employment"); N.Y. Rent Stabilization Law (N.Y.C. Admin. Code) § 26-511(c)(13) (allowing rent increases for "a substantial modification or increase of dwelling space"); N.Y. Rent Stabilization Law § 26-511(c)(11)(a) (allowing special increases where rent is "substantially different from the rents generally prevailing in the same area for substantially similar housing accommodations"); N.Y. Emergency Tenant Protection Act (McKinney's Uncons. Laws of N.Y.) § 8625(a)(5) (exempting from regulation "buildings substantially rehabilitated as family units"); N.Y.C. Rent Stabilization Code (9 N.Y.C.R.R.) § 2523.4 (permitting eviction for breach of "substantial obligation" of tenancy or "interfering substantially" with the comfort or safety of others.").

### B. CEEFPA Does Not Deprive Plaintiffs of the Opportunity to be Heard on Their Claims

As to Plaintiffs' procedural due process claim, they assert that CEEFPA prevents Plaintiffs from being heard at a meaningful time or manner because they cannot challenge a Hardship Declaration submitted by a tenant. Pl.'s Mem. at 22. To support his proposition, Plaintiffs cite to

*Mathews v. Eldridge*, a case that challenged administrative procedures terminating Social Security benefits: "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." 424 U.S. 319, 335 (1976).

Contrary to Plaintiffs' implication, being heard in a meaningful time and manner does not mean that Plaintiffs must have the right to be heard as soon as any claim arises. The *Mathews* Court additionally explained that due process "is not a technical conception with a fixed content unrelated to time, place, and circumstances." *Mathews*, 424 U.S. at 334. It is "flexible and calls for such procedural protections as the particular situation demands." *Id.* (internal quotations omitted). But as the Court in *Elmsford Apartment Assocs., LLC V. Cuomo*, pointed out, "No case says that "a meaningful time" means as soon as a cause of action accrues – especially where, as in New York, the filing of a summary proceeding is but the first step in what often takes years to accomplish, which is the ultimate eviction of a tenant." *Elmsford Apartment Assocs., LLC V. Cuomo*, 469 F.Supp.3d 148, 173 (S.D.N.Y. 2020).

CEEPFA's Hardship Declaration does not implicate Plaintiffs' Due Process rights. When a tenant submits a Hardship Declaration, it temporarily delays the prosecution of an eviction case.[41] It is clear that Plaintiffs reserve all rights to unpaid rents from tenants that fall under the scope of the order. Plaintiffs will be able to pursue eviction cases in the same manner and forum as they always have after May 1st. *See Elmsford Apartment Assocs., LLC*, 469 F.Supp.3d, at 173 (S.D.N.Y. 2020).

For these reasons, Plaintiffs' due process claims must fail.

**VII.  CEEFPA DOES NOT DEPRIVE PLAINTIFFS OF THEIR RIGHT TO PETITION**

---

[41] Unless the landlord alleges that the tenant is creating a nuisance or causing damage.  See CEEFPA §9.

Plaintiffs wrongly assert that CEEFPA deprives them of their right to petition. As the Supreme Court has recognized, the constitutional basis for the right to petition is unsettled. *Christopher v. Harbury*, 536 U.S. 402, 415, n.12 (2002). While its constitutional basis may be unsettled, Courts have recognized that at its base right to access cases "provide some effective vindication of a separate and distinct right to seek judicial relief for some wrong." *Id*. at 414–15. However, the right to seek judicial relief for some wrong does not mean that litigants have a guaranteed constitutional right as to his or her preferred remedy. *Inmates of Suffolk Cty. Jail v. Rouse*, 129 F.3d 649, 660 (1st Cir. 1997) (holding that there is no constitutional right to a specific form of relief); *see also Elmsford*, 469 F.Supp.3d, at 174 (finding that the Petition Clause was not violated because "although nonpayment proceedings have been suspended, [p]laintiffs can still sue . . . and the fact that is not their preferred remedy is of no moment."). Indeed, the Second Circuit has recognized that "[t]he right to petition exists in the presence of an underlying cause of action and is not violated by a statute that provides a complete defense to a cause or curtails a category of causes of action. *City of New York v. Beretta U.S.A. Corp.*, 425 F.3d 384, 397 (2d Cir. 2008). In *City of New York*, the Court upheld the challenged law even though it immunized a specific type of defendant from a specific type of case, finding that the law did not "impede, let alone entirely foreclose, general use of the courts by would-be plaintiffs." *Id.* at 396. Nothing in CEEFPA forecloses the general use of the courts by Plaintiffs.

In a recent case considering Governor Cuomo's Executive Orders which temporary banned all filings, proceedings and evictions, a court in the Southern District dismissed as meritless the argument that the Executive Orders infringed on the Plaintiffs right to access the courts. *Elmsford Apartment Assocs., LLC*, 469 F.Supp.3d, at 173. The Executive Orders at issue in *Elmsford* were different from EEFPA but the analysis of the issue is instructive. The Court held that the

19

constitutional right of access to the courts does not confer a right to bring a particular cause of action or to bring an action at a preferred time. *Id*. at 174. The Court relied on the fact that in New York landlords can seek rent arrears in other proceedings and that a mere delay in filing a case could not form the basis of a right to petition claim. *Id*. As for a delay in proceeding in cases that were previously filed, the Court found that evicting tenants in New York is slow and cumbersome. *Id*. at 158.

Even in jurisdictions where eviction proceedings are neither slow nor cumbersome, Courts across the country have dismissed claims brought by landlords claiming that the various local, state and federal moratoria issued in response to the COVID-19 crisis, have violated landlords right to petition and denied their access to the courts. *See, e.g., Heights Apartments, LLC v.Walz*, No. 20-CV-2051 (NEB/BRT) 2020 WL 7828818 (D. Minn., 2020); *Brown v. Azar*, No. 1:20-CV-03702-JPB, 2020 WL 6364310 (N.D. Ga. 2020); *Baptiste. v. Kennealy*, 2020 WL 5751572 (D. Mass. 2020). As in *Elmsford*, courts have relied on the temporary nature of the prohibitions. *See, Heights Apartments, LLC*, 2020 WL 7828818, at *13 (moratorium was issued in March and as of the date of the decision was in effect until January 13, 2021); *Baptiste*, 2020 WL 5751572, at *27 (moratorium was issued in March and remained in effect until October 17, 2020). Additionally, courts have noted that rent is still owed and that landlords are not foreclosed from seeking other remedies to collect back rent through breach of lease cases. *See Brown*, 2020 WL 6364310 at 16; *Heights Apartments,* 2020 WL 7828818, at *13.

Like Governor Cuomo's Executive Orders, the CDC moratorium and the moratoria at issue in Massachusetts and Minnesota, CEEFPA does not deny landlords access to the courts, it simply temporarily delays landlords' ability to seek rent and possession in an eviction proceeding. The statute, and the Hardship Declaration complained of in this proceeding, make clear that tenants

continue to owe rent and that tenants may owe late fees, interest and penalties for failing to pay rent. *See* CEEFPA Part A. § 1, § 4. Additionally, as noted in the Hardship Declaration, nothing in CEEFPA prevents landlords from seeking money judgments for tenants who owe rent. *Id.* The Plaintiffs whose tenants have filed Hardship Declarations will be able to move forward with the cases in May at the conclusion of the moratorium which means that CEEFPA has not infringed on Plaintiffs right to petition. The Plaintiffs whose tenants have failed to submit Hardship Declarations and the ones who allege nuisance behavior can file and prosecute their cases as well as any litigant can pursue a case in the midst of an unprecedented pandemic.

As Plaintiffs have not been denied the right to petition, this claim fails.

## VIII.  THE BALANCE OF THE EQUITIES FAVORS THE STATE'S INTEREST IN PROTECTING THE PUBLIC HEALTH IN THE MIDST OF A GLOBAL PANDEMIC

The Second Circuit has repeatedly held that the "where the moving party seeks to stay government action taken in the public interest pursuant to a statutory or regulatory scheme, the district court should not apply the less rigorous fair-ground-for-litigation standard and should not grant the injunction unless the moving party establishes, along with irreparable injury, a likelihood that he will succeed on the merits of his claim." *Plaza Health Laboratories, Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir. 1989); *Lynch v. City of New York*, 589 F.3d 94, 99 (2d Cir. 2009). "This exception reflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995). "Where the grant of interim relief may adversely affect the public interest in a manner which cannot be compensated for by an injunction bond, plaintiffs undertake an even

greater burden of persuasion. *Medical Soc'y of State of New York v. Toia*, 560 F.2d 535, 538 (2d Cir. 1977).

Plaintiffs, having failed to show a likelihood of success on any of their claims, make only the most cursory of efforts to argue that the balance of the equities favors an injunction against a statutory scheme designed to protect hundreds of thousands of tenants against the possibility of eviction in the middle of a pandemic, and to protect the public against the health consequences of such mass evictions.

In *Brown v. Azar*, the District Court declined to issue an injunction suspending the eviction moratorium issued by the Centers for Disease Control. The court weighed evidence

> that mass evictions could have dire consequences . . . . This includes evidence of an anticipated surge in infections because displaced tenants may be forced into crowded living quarters or homeless shelters, where compliance with public health guidelines, including social distancing and self-quarantining, is impossible . . . . In other words, the consequences of eviction (overcrowding, homelessness and housing instability) undermine crucial strategies for containing COVID-19. And the deleterious effect is not limited to the millions who might be evicted, it extends to the community at large.

*Id.*, at *22. Comparing the harm alleged by the plaintiffs in that case, the court found that

> Even if Plaintiffs did show a constitutional violation, the showing would not be enough to outweigh the public interest. Although Plaintiffs have shown an economic harm, that economic harm pales in comparison to the significant loss of lives that Defendants have demonstrated could occur should the Court block the Order.

*Id.* at *23. *Accord, Chambless Enterprises, LLC v. Redfield*, 3:20-CV-01455, 2020 WL 7588849 (W.D. La 2020).

*Brown* and *Chambless* are in harmony with decisions of federal courts across the country that routinely concluded that staying government action to contain a contagious and fast-spreading disease would result in comparatively more severe injury to the community than the alleged damage to business interests. *See, Auracle Homes, LLC v. Lamont*, No. 3:20-CV-00829, 2020 WL

4558682 at *21 (D. Conn. 2020) (refusing to enjoin an eviction moratorium); *HAPCO v. City of Philadelphia*, 482 F.Supp.3d 337, 364 (E.D. Pa. 2020) (also refusing to enjoin an eviction moratorium); *Apartment Assoc. of Los Angeles County, Inc. v. City of Los Angeles*, 20-CV-05193, 2020 WL 6700568 at *11 (C.D. Cal. 2020) (economic harm to landlords "must yield precedence to the vital interests of the public as a whole").

Here, as in *Tiger Lily LLC v. U.S. Dep't of Hous. and Urban Dev.*, "the fact is, despite Plaintiffs' creative framing, at bottom Plaintiffs are likely to suffer monetary damages, not irreparable harm, and their bevy of constitutional claims do not change this conclusion." 2020 WL 7658126 at *10 (W.D. Tenn. 2020). Balancing the equities of protecting the public health versus temporary economic harm to landlords such as Plaintiffs herein, this Court must give precedence to the government's urgent need to contain the COVID pandemic.

## **CONCLUSION**

*Amici* respectfully submit that Plaintiffs' motion for a preliminary injunction should be denied.

Respectfully submitted,

LEGAL SERVICES NYC
Edward Josephson, Director of Litigation
Roland Nimis, of counsel
40 Worth Street, Suite 606
New York, NY 10013
Tel: (718) 237-5538
ejosephson@lsnyc.org

THE LEGAL AID SOCIETY
Judith Goldiner, Esq., Attorney in Charge,
Civil Law Reform Unit
Ellen Davidson, of counsel
199 Water Street
New York, NY 10038
Tel: 212-577-3332
jgoldiner@legal-aid.org