UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
PANTELIS CHRYSAFIS, BETTY COHEN,
BRANDIE LACASSE, MUSAN SHI and
FENG ZHOU,

                           Plaintiffs,

                -against-

LETITIA JAMES, in her official capacity as
Attorney General of the State of New York,

                          Defendant.
---------------------------------------------------------------X

                                **OPINION AND ORDER**
                                21-cv-998 (JS)(ARL)

SEYBERT, United States District Judge:

       On February 24, 2021, plaintiffs Pantelis Chrysafis ("Chrysafis"), Betty Cohen ("Cohen"), Brandie LaCasse ("LaCasse"), Musan Shi ("Shi") and Feng Zhou ("Zhou") (collectively, "Plaintiffs") commenced this action against Letitia James (the "Attorney General" or "Defendant"), in her official capacity as Attorney General of the State of New York, *inter alia*, challenging the constitutionality of Part A of the New York COVID-19 Emergency Eviction and Foreclosure Prevention Act of 2020 ("CEEFPA"), which was signed into law on December 28, 2020. Pending before the Court are: (i) Plaintiffs' motion, *inter alia*, for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure, enjoining the Attorney General, her representatives and agents, "and all persons acting in concert or in participation with them, or having notice, from implementing or enforcing Part A of [CEEFPA], until such time as the Court resolves Plaintiffs' application for permanent relief in this case," (Docket Entry ["DE"] 5); and (ii) the Attorney General's motion to dismiss this action pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure for lack of subject matter

1

jurisdiction and failure to state a claim for relief. For the reasons set forth below, the Attorney General's motion is granted and Plaintiffs' motion is denied.

## I.    BACKGROUND

### A.  Factual Background

CEEFPA was signed into law on December 28, 2020. The following is the express legislative intent of the statute:

> "On March 7, 2020, Governor Andrew Cuomo proclaimed a state of emergency in response to the Coronavirus disease (COVID-19) pandemic. Measures necessary to contain the spread of COVID-19 have brought about wide-spread economic and societal disruption, placing the state of New York in unprecedented circumstances.
>
> COVID-19 presents a historic threat to public health. Hundreds of thousands of residents are facing eviction or foreclosure due to necessary disease control measures that closed businesses and schools, and triggered mass-unemployment across the state. The pandemic has further interrupted court operations, the availability of counsel, the ability for parties to pay for counsel, and the ability to safely commute and enter a courtroom, settlement conference and the like.
>
> Stabilizing the housing situation for tenants, landlords, and homeowners is to the mutual benefit of all New Yorkers and will help the state address the pandemic, protect public health, and set the stage for recovery. It is, therefore, the intent of this legislation to avoid as many evictions and foreclosures as possible for people experiencing a financial hardship during the COVID-19 pandemic or who cannot move due to an increased risk of severe illness or death from COVID-19.
>
> As such, it is necessary to temporarily allow people impacted by COVID-19 to remain in their homes. A limited, temporary stay is necessary to protect the public health, safety and morals of the people the Legislature represents from the dangers of the COVID-19 emergency pandemic."

(Complaint ["Compl."], Ex. A at 2).

Section 2 of Part A of CEEFPA pertains to pending eviction proceedings and provides,

> "Any eviction proceeding pending on the effective date of this act, including eviction proceedings filed on or before March 7, 2020, or commenced within thirty days of the effective date of this act shall be stayed for at least sixty days, or to such later date that the chief administrative judge shall determine is necessary to ensure

that courts are prepared to conduct proceedings in compliance with this act and to give tenants an opportunity to submit the hardship declaration pursuant to this act[1]. The court in each case shall promptly issue an order directing such stay and promptly mail the respondent a copy of the hardship declaration in English, and, to the extent practicable, the tenant's primary language, if other than English."

(Compl., Ex. A at 4). "Eviction proceeding" is defined to mean "a summary proceeding to recover possession of real property under article seven of the real property actions and proceedings law relating to a residential dwelling unit or any other judicial or administrative proceeding to recover possession of real property relating to a residential dwelling unit." (*Id.* at 2, § 1(1)). A "tenant" is defined as including "a residential tenant, lawful occupant of a dwelling unit, or any other person responsible for paying rent, use and occupancy, or any other financial obligation under a residential lease or tenancy agreement, but does not include a residential tenant or lawful occupant with a seasonal use lease where such tenant has a primary residence to which to return to." (*Id.* at 2, § 1(3)).

A "hardship declaration" is defined to mean "the following statement, or a substantially equivalent statement in the tenant's primary language, in 14-point type, published by the office of court administration, whether in physical or electronic written form:

'NOTICE TO TENANT: If you have lost income or had increased costs during the COVID-19 pandemic, or moving would pose a significant health risk for you or a member of your household due to an increased risk for severe illness or death from COVID-19 due to an underlying medical condition, and you sign and deliver this hardship declaration form to your landlord, you cannot be evicted until at least May 1, 2021 for nonpayment of rent or for holding over after the expiration of your lease. You may still be evicted for violating your lease by persistently and unreasonably engaging in behavior that substantially infringes on the use and enjoyment of other tenants or occupants or causes a substantial safety hazard to others.

If your landlord has provided you with this form, your landlord must also provide you with a mailing address and e-mail address to which you can return this form. If your landlord has already started an eviction proceeding against you, you can return this form to either your landlord, the court, or both at any time. You should

---

[1] The initial stay of eviction proceedings was not extended by the chief administrative judge and expired on February 26, 2021, *i.e.*, two (2) days after this action was commenced.

keep a copy or picture of the signed form for your records. You will still owe any unpaid rent to your landlord. You should also keep careful track of what you have paid and any amount you still owe.

For more information about legal resources that may be available to you, go to www.nycourts.gov/evictions/nyc/ or call 718-557-1379 if you live in New York City or go to www.nycourts.gov/evictions/outside-nyc/ or call a local bar association or legal services provider if you live outside of New York City. Rent relief may be available to you, and you should contact your local housing assistance office.

TENANT'S DECLARATION OF HARDSHIP DURING THE COVID-19 PANDEMIC

I am a tenant, lawful occupant, or other person responsible for paying rent, use and occupancy, or any other financial obligation under a lease or tenancy agreement at (address of dwelling unit). YOU MUST INDICATE BELOW YOUR QUALIFICATION FOR EVICTION PROTECTION BY SELECTING OPTION "A" OR "B", OR BOTH.

A.      ( ) I am experiencing financial hardship, and I am unable to pay my rent or other financial obligations under the lease in full or obtain alternative suitable permanent housing because of one or more of the following:

1. Significant loss of household income during the COVID-19 pandemic.

2. Increase in necessary out-of-pocket expenses related to performing essential work or related to health impacts during the COVID-19 pandemic.

3. Childcare responsibilities or responsibilities to care for an elderly, disabled, or sick family member during the COVID-19 pandemic have negatively affected my ability or the ability of someone in my household to obtain meaningful employment or earn income or increased my necessary out-of-pocket expenses.

4. Moving expenses and difficulty I have securing alternative housing make it a hardship for me to relocate to another residence during the COVID-19 pandemic.

5. Other circumstances related to the COVID-19 pandemic have negatively affected my ability to obtain meaningful employment or earn income or have significantly reduced my household income or significantly increased my expenses. To the extent that I have lost household income or had increased expenses, any public assistance, including unemployment insurance, pandemic unemployment assistance, disability insurance, or paid family leave, that I have received since the start of the COVID-19 pandemic does not fully make up for my loss of household income or increased expenses.

4

B.      (  ) Vacating the premises and moving into new permanent housing would pose a significant health risk because I or one or more members of my household have an increased risk for severe illness or death from COVID-19 due to being over the age of sixty-five, having a disability or having an underlying medical condition, which may include but is not limited to being immunocompromised.

I understand that I must comply with all other lawful terms under my tenancy, lease agreement or similar contract. I further understand that lawful fees, penalties or interest for not having paid rent in full or met other financial obligations as required by my tenancy, lease agreement or similar contract may still be charged or collected and may result in a monetary judgment against me. I further understand that my landlord may be able to seek eviction after May 1, 2021, and that the law may provide certain protections at that time that are separate from those available through this declaration.

Signed:
Printed name:
Date signed:

NOTICE: You are signing and submitting this form under penalty of law. That means it is against the law to make a statement on this form that you know is false.'"

(Compl., Ex. A at 2-4, § 1(4)). Section 10 of CEEFPA Part A requires the office of court administration to translate the hardship declaration "into Spanish and the six (6) most common languages in the city of New York, after Spanish," and to "post and maintain such translations and an English language copy of the hardship declaration on the website of such office beginning within fifteen days of the effective date of this act." (*Id.* at 7). In addition, that section provides that "[t]o the extent practicable, the office of court administration shall post and maintain on its website translations into such additional languages as the chief administrative judge shall deem appropriate to ensure that tenants have an opportunity to understand and submit hardship declarations pursuant to this act."[2] (*Id.*)

Section 3 of CEEFPA Part A pertains to pre-eviction notices and provides:

---

[2]  The hardship declaration is available on the Office of Court Administration website in approximately twenty (20) languages. *See* https://www.nycourts.gov/eefpa/ (last visited 4/6/2021).

"A landlord shall include a 'Hardship Declaration' in 14-point type, with every written demand for rent made pursuant to subdivision 2 of section 711 of the real property actions and proceedings law[3], with any other written notice required by the lease or tenancy agreement, law or rule to be provided prior to the commencement of an eviction proceeding, and with every notice of petition served on a tenant. If the translation of the hardship declaration in the tenant's primary language is not available on the office of court administration's public website, as provided by section ten of this act, it shall be the landlord's responsibility to obtain a suitable translation of the hardship declaration in the tenant's primary language. Such notice shall also include:

1. a mailing address, telephone number and active email address the tenant can use to contact the landlord and return the hardship declaration; and

2. a list of all not-for-profit legal service providers actively handling housing matters in the county where the subject premises are located. Such lists shall be prepared and regularly updated, to the extent practicable, for such purpose and published on the website of the office of court administration."

(Compl., Ex. A at 4). "Landlord" is defined in CEEFPA Part A as including "a landlord, owner of a residential property and any other person with a legal right to pursue eviction, possessory action or a money judgment for rent, including arrears, owed or that becomes due during the COVID-19 covered period, as defined in section 1 of chapter 127 of the laws of 2020." (*Id.* at 2, § 1(2)).

Section 4 of CEEFPA Part A pertains to the initiation of eviction proceedings and provides, "If there is no pending eviction proceeding and a tenant provides a hardship declaration to the landlord or an agent of the landlord, there shall be no initiation of an eviction proceeding

---

[3] N.Y. Real Prop. Acts. Law § 711(2) provides, in pertinent part: "No tenant or lawful occupant of a dwelling or housing accommodation shall be removed from possession except in a special proceeding. A special proceeding may be maintained under this article upon the following grounds: . . . 2. The tenant has defaulted in the payment of rent, pursuant to the agreement under which the premises are held, and a written demand of the rent has been made with at least fourteen days' notice requiring, in the alternative, the payment of the rent, or the possession of the premises, has been served upon him as prescribed in section seven hundred thirty-five of this article." Contrary to Plaintiffs' contention, (*see* Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion To Dismiss Based on Eleventh Amendment Immunity ["Plf. Opp."] at 15-16), it is clear from the reference to N.Y. Real Prop. Acts Law § 711(2) in Section 3 of CEEFPA Part A, and from Section 5 of CEEFPA Part A, set forth below, that Section 3 of CEEFPA Part A is enforced by the state court refusing to allow a landlord who fails to comply therewith to initiate an eviction proceeding or staying a proceeding if the petition has already been accepted.

against the tenant until at least May 1, 2021, and in such event any specific time limit for the commencement of an eviction proceeding shall be tolled until May 1, 2021." (Compl., Ex. A at 4-5). Thus, Section 4 of CEEFPA Part A temporarily prohibits, until May 1, 2021, initiation of new eviction proceedings against tenants who provide a completed hardship declaration to their landlord.

Section 5 of CEEFPA Part A also pertains to the commencement of an eviction proceeding and provides, in pertinent part:

"1. No court shall accept for filing any petition or other filing to commence an eviction proceeding unless the petitioner or an agent of the petitioner files an affidavit of service, under penalty of perjury, demonstrating the manner in which the petitioner or the petitioner's agent served a copy of the hardship declaration in English and the tenant's primary language, if other than English, with any rent demand and with any other written notice required by the lease or tenancy agreement, law or rule to be provided prior to the commencement of an eviction proceeding, and an affidavit under penalty of perjury:

a. attesting that at the time of filing, neither the petitioner nor any agent of the petitioner has received a hardship declaration from the respondent or any other tenant or occupant of the dwelling unit that is the subject of the proceeding, or

b. attesting that the respondent or another tenant or occupant of the dwelling unit that is the subject of the proceeding has returned a hardship declaration, but the respondent is persistently and unreasonably engaging in behavior that substantially infringes on the use and enjoyment of other tenants or occupants or causes a substantial safety hazard to others, with a specific description of the behavior alleged.

2. Upon accepting a petition pursuant to article 7 of the real property actions and proceedings law, the attorney, judge or clerk of the court, as the case may be, shall determine whether a copy of the hardship declaration in English and the tenant's primary language, if other than English, is annexed to the served notice of petition and, if not, shall ensure that the hardship declaration is attached to such notice. Service of the notice of petition with the attached hardship declaration shall be made by personal delivery to the respondent, unless such service cannot be made with due diligence, in which case service may be made under section 735 of the real property actions and proceedings law. At the earliest possible opportunity, the court shall seek confirmation on the record or in writing from the respondent that the respondent has received the hardship declaration and that the respondent has not submitted a hardship declaration to the petitioner, an agent of the petitioner, or

the court. If the court determines a respondent has not received a hardship declaration, then the court shall stay the proceeding for a reasonable period of time, which shall be no less than ten business days or any longer period provided by law, and provide the respondent with a copy of the hardship declaration in English and the respondent's primary language, if other than English, to ensure the respondent received and fully considered whether to submit the hardship declaration."

(Compl., Ex. A at 5). Thus, a landlord may commence an eviction proceeding at any time if he or she files with the court, together with a petition to commence proceedings, an affidavit stating either: (i) that he or she provided a form hardship declaration to a tenant and had not received the completed form back; or (ii) that the tenant is engaging in ongoing nuisance activity, regardless of whether that tenant has provided a hardship declaration. If neither affidavit is annexed to the petition, the court may not accept the petition for filing or, if the petition has already been accepted, must stay the proceeding.

Section 6 of CEEFPA Part A pertains to pending eviction proceedings and provides: "In any eviction proceeding in which an eviction warrant has not been issued, including eviction proceedings filed on or before March 7, 2020, if the tenant provides a hardship declaration to the petitioner, the court, or an agent of the petitioner or the court, the eviction proceeding shall be stayed until at least May 1, 2021. If such hardship declaration is provided to the petitioner or agent, such petitioner or agent shall promptly file it with the court, advising the court in writing the index number of all relevant cases." (Compl., Ex. A at 5). Thus, where no warrant of eviction has been issued in a pending proceeding, a tenant's submission of a completed hardship declaration requires the court to stay the matter until May 1, 2021.

Section 7 of CEEFPA Part A pertains to default judgments and provides:

"No court shall issue a judgment in any proceeding authorizing a warrant of eviction against a respondent who has defaulted, or authorize the enforcement of an eviction pursuant to a default judgment, prior to May 1, 2021, without first holding a hearing after the effective date of this act upon motion of the petitioner. The petitioner or an agent of the petitioner shall file an affidavit attesting that the

8

petitioner or the petitioner's agent has served notice of the date, time, and place of such hearing on the respondent, including a copy of such notice. If a default judgment has been awarded prior to the effective date of this act, the default judgment shall be removed and the matter restored to the court calendar upon the respondent's written or oral request to the court either before or during such hearing and an order to show cause to vacate the default judgment shall not be required."

(Compl., Ex. A at 5-6).

Section 8 of CEEFPA Part A pertains to eviction proceedings in which an eviction

warrant was issued prior to the effective date of the Act and provides:

"a. (i) In any eviction proceeding in which an eviction warrant has been issued prior to the effective date of this act, but has not yet been executed as of the effective date of this act, including eviction proceedings filed on or before March 7, 2020, the court shall stay the execution of the warrant at least until the court has held a status conference with the parties. (ii) In any eviction proceeding, if the tenant provides a hardship declaration to the petitioner, the court, or an agent of the petitioner or the court, prior to the execution of the warrant, the execution shall be stayed until at least May 1, 2021. If such hardship declaration is provided to the petitioner or agent of the petitioner, such petitioner or agent shall promptly file it with the court, advising the court in writing the index number of all relevant cases.

b. In any eviction proceeding in which a warrant has been issued, including eviction proceedings filed on or before March 7, 2020, any warrant issued shall not be effective as against the occupants, unless, in addition to the requirements under section 749 of the real property actions and proceedings law for warrants, such warrant states: (i) The tenant has not submitted the hardship declaration and the tenant was properly served with a copy of the hardship declaration pursuant to this section, listing dates the tenant was served with the hardship declaration by the petitioner and the court; or (ii) The tenant is ineligible for a stay under this act because the court has found that the tenant is persistently and unreasonably engaging in behavior that substantially infringes on the use and enjoyment of other tenants or occupants or causes a substantial safety hazard to others, with a specific description of the behavior.

c. No court shall issue a warrant directed to the sheriff of the county or to any constable or marshal of the city in which the property, or a portion thereof, is situated, or, if it is not situated in a city, to any constable of any town in the county, that does not comply with the requirements of this section.

d. No officer to whom the warrant is directed shall execute a warrant for eviction issued that does not comply with the requirements of this section.

> e. Unless the warrant contains the information contained in paragraph (ii) of subdivision b of this section, if any tenant delivers the hardship declaration to the officer to whom the warrant is directed, the officer shall not execute the warrant and shall return the hardship form to the court indicating the appropriate index/case number the form is associated with."

(Compl., Ex. A at 6).

Section 9 of CEEFPA Part A provides:

> "Sections two, four, six and paragraph (ii) of subdivision a of section eight of this act shall not apply if the tenant is persistently and unreasonably engaging in behavior that substantially infringes on the use and enjoyment of other tenants or occupants or causes a substantial safety hazard to others, provided:
>
> 1. If an eviction proceeding is pending on the effective date of this act, but the petitioner has not previously alleged that the tenant persistently and unreasonably engaged in such behavior, the petitioner shall be required to submit a new petition with such allegations and comply with all notice and service requirements under article 7 of the real property actions and proceedings law and this act.
>
> 2. If the court has awarded a judgment against a respondent prior to the effective date of this act on the basis of objectionable or nuisance behavior, the court shall hold a hearing to determine whether the tenant is continuing to persist in engaging in unreasonable behavior that substantially infringes on the use and enjoyment of other tenants or occupants or causes a substantial safety hazard to others.
>
> 3. For the purposes of this act, a mere allegation of the behavior by the petitioner or an agent of the petitioner alleging such behavior shall not be sufficient evidence to establish that the tenant has engaged in such behavior.
>
> 4. If the petitioner fails to establish that the tenant persistently and unreasonably engaged in such behavior and the tenant provides or has provided a hardship declaration to the petitioner, petitioner's agent or the court, the court shall stay or continue to stay any further proceedings until at least May 1, 2021.
>
> 5. If the petitioner establishes that the tenant persistently and unreasonably engaged in such behavior or the tenant fails to provide a hardship declaration to the petitioner, petitioner's agent or the court, the proceeding may continue pursuant to article 7 of the real property actions and proceedings law and this act."

(Compl., Ex. A at 6-7). Thus, none of the stay provisions of CEEFPA Part A applies where a

tenant creates a nuisance or safety hazard.

Section 11 of CEEFPA Part A provides: "A hardship declaration in which the tenant has selected the option indicating a financial hardship shall create a rebuttable presumption that the tenant is experiencing financial hardship, in any judicial or administrative proceeding that may be brought, for the purposes of establishing a defense under chapter 127 of the laws of 2020, an executive order of the governor or any other local or state law, order or regulation restricting the eviction of a tenant suffering from a financial hardship during or due to COVID-19 provided that the absence of a hardship declaration shall not create a presumption that a financial hardship is not present." (Compl., Ex. A at 7). The court determines whether the landlord has rebutted the presumption by applying statutory factors that preexisted CEEFPA, Ch. 127, L. 2020; and the defense of financial hardship will no longer be available once the COVID-19-related economic restrictions are lifted in the county of the tenant's residence. Ch. 127, L. 2020.

Section 12 of CEEFPA Part A is a severance provision which provides: "If any clause, sentence, paragraph, section or part of this act shall be adjudged by any court of competent jurisdiction to be invalid and after exhaustion of all further judicial review, the judgment shall not affect, impair or invalidate the remainder thereof, but shall be confined in its operation to the clause, sentence, paragraph, section or part of this act directly involved in the controversy in which the judgment shall have been rendered." (Compl., Ex. A at 7).

Finally, Section 13 of CEEFPA Part A provides, "This act shall take effect immediately and sections three, four, five, six, seven, eight, nine, ten and twelve of this act shall expire May 1, 2021." (Compl., Ex. A at 8).

CEEFPA Part B, subparts A and B, contain similar provisions with respect to mortgage foreclosure and tax foreclosure actions, respectively. No part of CEEFPA expressly sets forth

11

any penalty, either civil or criminal, for noncompliance; and no part of CEEFPA references the Attorney General.

The day after CEEFPA went into effect, the Attorney General's office provided a memorandum to New York State Sheriffs "to provide an overview of the new legislation and impacts for Sheriffs and other law enforcement offices throughout New York State charged with carrying out evictions." (Supplemental Declaration of Akiva Shapiro in Further Support of Plaintiffs' Application for a Temporary Restraining Order and Preliminary Injunction ["Shapiro Supp."], Ex. 7; Declaration of Akiva Shapiro in Support of Plaintiffs' Opposition to Defendant's Motion To Dismiss ["Shapiro MTD Decl."], Ex. 2). The memorandum provides, in pertinent part:

> "The [C]EEFPA applies to any court or administrative eviction proceeding, including all Article 7 summary proceedings under the NYS Real Property Actions and Proceedings Law.
>
> **The [C]EEFPA stays the execution of most evictions as well as the commencement of new eviction cases, with some narrow exceptions, until May 1, 2021.** Tenants and occupants are given the opportunity to submit hardship declaration forms to their landlords, to the courts and even at the point of execution of a warrant, to a Sheriff, Constable or Marshal to immediately stop their eviction or prevent an eviction case from being filed against them.
>
> Sheriffs, constables and marshals are specifically stayed from executing any outstanding warrants of eviction obtained by default judgment until and unless the court holds a hearing to review the default.
>
> Officers charged with carrying out evictions will need to pay careful attention to whether warrants of eviction from the courts contain the necessary language to ensure that the eviction can be legally conducted.
>
> The Office of the New York State Attorney General is available to assist local Sheriffs and Constable departments as they familiarize themselves with the applicable provisions of the new law which they are charged with enforcing. . . ."

(Shapiro Supp. Ex. 7; Shapiro MTD Decl., Ex. 2) (emphasis in original). The memorandum then summarizes the major provisions of the CEEFPA.

A press release issued approximately one week later, on January 7, 2021[4], provides, in pertinent part:

> "New York Attorney General Letitia James today issued guidance to the New York State Sheriffs' Association that provides key reminders regarding law enforcement's role in the eviction process during the coronavirus disease 2019 (COVID-19) public health crisis.
>
> On December 28, 2020, the COVID-19 Emergency Evictions and Foreclosure Prevention Act of 2020 was signed into law, providing protections for tenants at risk of eviction, including clarification for law enforcement officials carrying out evictions. The law allows tenants to get an automatic stay of eviction in all cases through May 1, 2021 by completing and sending a hardship declaration to their landlord, the court, a sheriff, marshal, or city constable. The law also makes all eviction warrants - those currently issued and those that will be issued - defective unless they contain specific language referencing the hardship declaration.
>
> 'As the financial instability spurred by the coronavirus continues, it is imperative for the state to enforce laws that protect New Yorkers from unlawfully losing their homes,' said Attorney General James. 'My office remains willing and able to assist local sheriffs and law enforcement departments as they familiarize themselves with the new law, which they are charged with enforcing.'
>
> * * *
>
> Upon receipt of a declaration, law enforcement officials are prohibited from evicting the tenant and occupants, and instead, must notify the court that a declaration has been received. The Office of the Attorney General (OAG) encourages sheriffs and other law enforcement officers who execute eviction warrants to provide declarations to all occupants when engaged in an eviction. The OAG continues to actively monitor housing practices throughout the state to ensure that unlawful evictions do not occur. The OAG has already sent cease and desist letters to landlords throughout the state who have unlawfully threatened tenants with eviction amidst the COVID-19 pandemic.[5] Additionally, Attorney General

---

[4]  https://ag.ny.gov/press-release/2021/attorney-general-james-provides-guidance-law-enforcement-group-evictions-during (last visited 4/6/2021).

[5]  There is no indication that the Attorney General sent any cease and desist letters in connection with Part A of CEEFPA, or at any time after that statute was enacted. Plaintiffs submit a news article dated July 8, 2020, *i.e.*, more than four (4) months prior to the enactment of CEEFPA Part A, indicating that the Attorney General investigated a law firm for sending "deceptive" eviction notices to tenants between March 25 and May 11, 2020, *i.e.*, after New York implemented a total ban on evictions. (Shapiro Supp., Ex. 10; Shapiro MTD Decl., Ex. 5). Similarly, the Attorney General's tweet providing "Guidance on Coronavirus Resources and Warnings about Consumer Scams" is dated May 8, 2020, more than seven (7) months prior to the enactment of CEEFPA. (Shapiro Supp., Ex. 11; Shapiro MTD Decl., Ex. 6). Moreover, as set forth below, the "unlawful eviction guidance" contained in the January 7, 2021 press release link, *inter alia*, to earlier press releases issued on April 16, 2020 and May 11, 2020. Indeed, Plaintiffs seemingly recognize the lack of connection between the cease and desist letters and earlier investigation and CEEFPA Part A by

James issued unlawful eviction guidance to law enforcement departments, and to New Yorkers highlighting how to navigate tenant issues related to COVID-19. Threats of eviction are not only illegal, but also damaging to the well-being of New Yorkers.

All COVID-19 guidance on tenant protections, among other important updates for the public and businesses, can be found on the OAG website."

(Shapiro Supp., Ex. 8; Shapiro MTD Decl., Ex. 3). The press release contained links to the "unlawful eviction guidance" referred to therein for both law enforcement departments and New Yorkers, *i.e.*, to a press release issued May 11, 2020, entitled "Attorney General James Provides Directions for Law Enforcement on Unlawful Evictions During COVID-19 Pandemic" under New York's Housing Stability and Tenant Protection Act of 2019, and a press release issued April 16, 2020 entitled "Attorney General James Issues Tenant Guidance for New Yorkers During Coronavirus Pandemic" under the New York Housing Stability and Tenant Protection Act of 2019; as well as to "[a]ll COVID-19 guidance on tenant protections" and "other important updates for the public and business." (*Id.*)

Plaintiffs allege that they are residential property owners who rent their properties to tenants, and that all of their tenants have stopped paying rent. (Compl. ¶ 8). Chrysafis alleges, *inter alia*, that he wants to sell his property; that in February 2020, he obtained a judgment against his tenants as well as a warrant of eviction ordering the tenants to vacate by April 1, 2020; that his tenants have not paid rent in over a year, but nevertheless remain in the home

---

contending, *inter alia*: (i) that "in connection with the State's pandemic eviction *moratoria*, [the Attorney General's] office has even sent out 'cease and desist' letters to landlords," (Plf. Opp. at 1) (emphasis added); (ii) that "[t]he AG has sent cease and desist letters to landlords and initiated investigations into 'deceptive and false' eviction notices in enforcing New York eviction *moratoria* throughout the pandemic." (*Id.* at 2) (emphasis added); and (iii) that "[t]he AG's *actions with respect to New York's previous eviction moratoria* also support her authority and intent to enforce CEEFPA. Her office 'has already sent cease and desist letters to landlords throughout the state who have unlawfully threatened tenants with eviction amidst the COVID-19 pandemic[;]' . . . [a]nd, under a prior eviction moratorium, the AG initiated an investigation into a law firm for serving 'deceptive and false' eviction notices to tenants." (*Id.* at 15). Furthermore, with respect to the investigation, enforcement actions against deceptive practices are under a different statute, *see* Gen. Bus. Law § 349, which is not applicable in this case.

because of the eviction moratoria; that forcing him to provide the hardship declaration to his tenants "will in essence invite his tenants to continue to refuse to pay rent;" and that his tenants "will certainly avail themselves of the vagueness of the hardship declaration form to assert financial hardship." (*Id.*)

Cohen, who is retired, is the owner of a single co-op unit in Brooklyn, New York, which she currently rents out to a tenant. (Compl., ¶ 8).  Cohen alleges, *inter alia*, that the rental income is her primary source of financial support, together with Social Security payments; that the tenant stopped paying rent starting in March 2020; that she sent a notice of late payment to her tenant and initiated an eviction proceeding in September 2020, "[b]ut CEEFPA has now barred [her] from taking any meaningful action to evict the tenant, reclaim her property, or recoup unpaid rent," (*id.*); that the tenant's annual lease expired in December 2020; that on February 4, 2021, "the tenant submitted what purports to be a hardship declaration form, checking the box for financial hardship," (*id.*); that "Cohen has no opportunity to contest his submission or receive clarification as to which category of financial hardship he claims applies," (*id.*); and that "[i]f the form is valid, she will not be able to evict her tenant, despite his nonpayment and the expiration of his lease, because the tenant's submission of a declaration form stays her case until May 1, 2021." (*Id.*).

LaCasse alleges, *inter alia*, that she owns and manages six (6) properties in New York, one (1) of which, *i.e.*, a single family house in Rhinebeck, she decided to sell in November 2020; that after she served the tenants of such property with a notice of nonrenewal pursuant to the terms of the lease, the tenants stopped paying rent in response and have refused to vacate the property despite the fact that the lease's term has concluded; that she filed a holdover proceeding against the tenants in December 2020, which was immediately dismissed as a result of CEEFPA;

that immediately thereafter, her tenants completed a hardship declaration form, claiming hardship in connection with their need for childcare, which "has barred her from taking any action to re-file suit to evict the tenants until May 2021;" and that "the tenants have violated numerous terms of the lease, causing significant damage to the property and resulting in multiple police calls in response to their conduct." (Compl., ¶ 8).

Shi and Zhou are spouses who own a single-family home in Staten Island, which they currently rent out to tenants. They allege, *inter alia*, that the rental income from the house they own helps cover their rent obligations for their leased family home; that their tenants stopped paying rent starting in the spring of 2019; and that they commenced a nonpayment action on October 31, 2019 and obtained a judgment, but before it could be enforced the proceeding was stayed due to the eviction moratoria. According to Shi and Zhou, "[f]orcing them to provide the hardship declaration form to their tenants effectively invites the tenants to continue to live in the property without paying rent. And their tenants will certainly avail themselves of the vague hardship categories of the declaration form to assert hardship." (Compl., ¶ 8).

In sum, all Plaintiffs wish to evict their tenants, either so that they may occupy their property themselves (Shi and Zhou), sell their property (LaCasse and Chrysafis) or, presumably, rent the property to a paying tenant (Cohen). Although LaCasse and Cohen allege that they have received hardship declarations from their tenants; Chrysafis, Shi and Zhou do not allege either that they received a hardship declaration from their tenants or that they served their tenants with the form. No Plaintiff alleges that he or she has attempted to move forward with an eviction proceeding since CEEFPA has been in effect, either by attesting that they provided a form hardship declaration and did not receive the completed form, or by attesting that any of their

tenants is creating a nuisance; nor does any Plaintiff allege that he or she plans to attempt to move forward with an eviction in violation of CEEFPA Part A or any other law.

The only allegation referencing the Attorney General in the complaint is:

> "Defendant Letitia James is the Attorney General of the State of New York and is responsible for defending the constitutionality of CEEFPA in this action as part of her duty under Executive Law § 63(1) to defend all actions and proceedings in which New York State is interested. She is also responsible for enforcement of any violations of the statute."

(Compl. ¶ 19).

### B. Procedural History

Although CEEFPA became effective on December 28, 2020 and is in effect for a total of four (4) months, *i.e.*, until May 1, 2021, Plaintiffs did not commence this action challenging the constitutionality of Part A of CEEFPA until February 24, 2021, (DE 1), approximately two (2) months after the effective date and halfway through the duration of the statute. They filed their motion for a temporary restraining order and preliminary injunction the following day. (DE 5).

Plaintiffs contend that Part A of CEEFPA deprives them of their federal and state constitutional rights in the following (five) ways: (1) CEEFPA compels property owners to disseminate government messages with which they disagree in violation of their rights under the First Amendment and the New York State Constitution by requiring them (a) to distribute to their tenants with every written demand for rent (i) hardship declaration forms drafted by the government, which invite tenants to avail themselves of the government's eviction moratorium; and (ii) a government-curated list of not-for profit legal service providers who are available to assist the tenants in seeking to avoid eviction, (b) to pay for the printing and mailing of those documents, and (c) to arrange and pay for the translation of the documents into certain languages

spoken by their tenants; (2) Part A of CEEFPA is void for vagueness under the federal and state

Due Process clauses because it enables tenants to avoid eviction and forsake their rental

obligations by declaring hardship based on vague and undefined categories, such as, *inter alia*,

"[s]ignificant loss of household income," "[i]ncrease in necessary out-of-pocket expenses" and

"other circumstances" purportedly related to the COVID-19 pandemic, inviting abuse and

arbitrary enforcement; (3) Part A of CEEFPA violates property owners' procedural due process

rights under the federal and state Due Process clauses by providing them with no way to

challenge or verify tenants' declarations of hardship; (4) Part A of CEEFPA violates Plaintiffs'

rights under the petition clauses of the First Amendment and New York State Constitution

because it prohibits landlords from exercising their rights to file eviction petitions against tenants

who have submitted a hardship declaration until at least May 1, 2021; and (v) that CEEFPA

violates the New York State Constitution's delegation of powers by granting the chief

administrative judge the unchecked power to unilaterally extend the eviction moratorium

statewide[6].

Plaintiffs now move, *inter alia*, for a preliminary injunction pursuant to Rule 65 of the

Federal Rules of Civil Procedure, enjoining the Attorney General, her representatives and agents,

"and all persons acting in concert or in participation with them, or having notice, from

implementing or enforcing Part A of [CEEFPA], until such time as the Court resolves Plaintiffs'

application for permanent relief in this case." (DE 5). The Attorney General moves pursuant to

---

[6] In Plaintiffs' Reply Memorandum of Law in Further Support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction ("Plf. Reply"), Plaintiffs state that "[f]or the purposes of this motion for preliminary relief, Plaintiffs do not contest the AG's position that the statutory deadline has passed, but reserve the right to challenge the judicial delegation provision should the AG attempt to disavow this position or the chief administrative judge seek to extend CEEFPA's automatic eviction stay." (Plf. Reply at 8-9, n. 4).

Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the complaint for

lack of subject matter jurisdiction and failure to state a claim for relief.

II.     DISCUSSION[7]

A.      Sovereign Immunity[8]

The Attorney General contends, *inter alia*, that this action is, in effect, one against the

State of New York that is barred by the Eleventh Amendment.

"The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may

not be sued by private individuals in federal court." *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531

U.S. 356, 363, 121 S. Ct. 955, 148 L. Ed. 2d 866 (2001). "State immunity extends to state

agencies and to state officers who act on behalf of the state. . . . Thus, when the state is the real

party in interest, the Eleventh Amendment generally bars federal court jurisdiction over an action

against a state official acting in his or her official capacity." *Burnette v. Carothers*, 192 F.3d 52,

57 (2d Cir. 1999); *see also Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 101-02,

104 S. Ct. 900, 79 L. Ed. 2d 67 (1984) ("The Eleventh Amendment bars a suit against state

officials when the state is the real, substantial party in interest. . . . And, as when the State itself

---

[7] Unless otherwise noted, case quotations omit all internal quotation marks, citations, footnotes, and alterations.

[8] Although the question of whether sovereign immunity "constitutes a true issue of subject matter jurisdiction or is more appropriately viewed as an affirmative defense is an open question in the Supreme Court and the Second Circuit," *Carver v. Nassau Cnty. Interim Fin. Auth.*, 730 F.3d 150, 156 (2d Cir. 2013), recent cases from the Second Circuit treat sovereign immunity as jurisdictional. *See, e.g. Williams v. Marinelli*, 987 F.3d 188, 196 (2d Cir. 2021) (finding that although insufficient briefing of an issue and "conclusory utterances might not suffice to preserve other issues for appellate review, we nonetheless must consider the Eleventh Amendment issue here because, if the relief sought by [the plaintiff] would violate the Amendment, we would lack the power to grant it."); *Vega v. Semple*, 963 F.3d 259, 284 (2d Cir. 2020) ("The Eleventh Amendment presents a jurisdictional bar that deprives federal courts of the power to hear certain claims. A federal court must examine each claim in a case to see if the court's jurisdiction over that claim is barred by the Eleventh Amendment.").

is named as the defendant, a suit against state officials that is in fact a suit against a State is barred regardless of whether it seeks damages or injunctive relief.")

However, in *Ex parte Young*, the Supreme Court carved out the following "limited exception," *CSX Transp., Inc. v. N.Y.S. Off. of Real Prop. Servs.*, 306 F.3d 87, 98 (2d Cir. 2002), to Eleventh Amendment state immunity: "[I]ndividuals who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action." *Ex parte Young*, 209 U.S. 123, 155-56, 28 S. Ct. 441, 52 L. Ed. 714 (1908); *see also Pennhurst*, 465 U.S. at 102, 104 S. Ct. 900 ("[A] suit challenging the constitutionality of a state official's action is not one against the State."); *Nat'l Ass'n for Advancement of Colored People v. Merrill*, 939 F.3d 470, 475 (2d Cir. 2019) ("The Eleventh Amendment bars suits against states and their officials unless the state consents to suit, Congress abrogates the state's immunity, or the case falls within the *Ex parte Young* exception."); *In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 371 (2d Cir. 2005) ("*Ex parte Young . . .* held that sovereign immunity did not bar actions seeking only prospective injunctive relief against state officials to prevent a continuing violation of federal law because a state does not have the power to shield its officials by granting them immunity from responsibility to the supreme authority of the United States.") As explained by the Supreme Court:

> "The act to be enforced is alleged to be unconstitutional; and if it be so, *the use of the name of the state to enforce an unconstitutional act to the injury of complainants* is a proceeding without the authority of, and one which does not affect, the state in its sovereign or governmental capacity. It is simply an illegal act upon the part of a state official in attempting, by the use of the name of the state, to enforce a legislative enactment which is void because unconstitutional. *If the act which the state attorney general seeks to enforce* be a violation of the Federal Constitution, the officer, in proceeding under such enactment, comes into conflict with the

> superior authority of that Constitution, and he is in that case stripped of his official
> or representative character and is subjected in his person to the consequences of his
> individual conduct. The state has no power to impart to him any immunity from
> responsibility to the supreme authority of the United States."

*Ex parte Young*, 209 U.S. at 159-160, 28 S. Ct. 441 (emphasis added); *see also Papasan v.*

*Allain*, 478 U.S. 265, 276, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986) (*Ex parte Young*'s "holding

was based on a determination that an unconstitutional state enactment is void and that any action

by a state official that is purportedly authorized by that enactment cannot be taken in an official

capacity since the state authorization for such action is a nullity.")

Thus, "through the doctrine of *Ex Parte Young*, a party may bring a suit for injunctive or

declaratory relief challenging the constitutionality of a state official's actions in enforcing state

law." *Riley v. Cuomo*, No. 2:17-cv-01631, 2018 WL 1832929, at *4 (E.D.N.Y. Apr. 16, 2018).

"The purpose of this exception is to ensure that the doctrine of sovereign immunity remains

meaningful, while also giving recognition to the need to prevent violations of federal law." *Dairy*

*Mart*, 411 F.3d at 372; *accord CSX Transp.*, 306 F.3d at 98.

"In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment

bar to suit, a court need only conduct a straightforward inquiry into whether the complaint

alleges an ongoing violation of federal law and seeks relief properly characterized as

prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645, 122 S. Ct.

1753, 152 L. Ed. 2d 871 (2002); *accord Merrill*, 939 F.3d at 475; *Dairy Mart*, 411 F.3d at 372.

Although Plaintiffs both allege ongoing violations of federal law, *i.e.*, that Part A of CEEFPA

deprives them of their rights under the First and Fourteenth Amendments to the United States

Constitution, and seek prospective injunctive relief to prevent a continuing violation of federal

law, they do not allege that the Attorney General, the only defendant named herein, is herself

committing any ongoing violation of federal law, *i.e.*, that the Attorney General is enforcing or

threatening to enforce the allegedly unconstitutional provisions of Part A of CEEFPA to the injury of Plaintiffs, that could be remedied by granting prospective injunctive relief against the Attorney General. *See Nassau & Suffolk Cnty. Taxi Owners Ass'n, Inc. v. State*, 336 F. Supp. 3d 50, 67-68 (E.D.N.Y. 2018) (finding that although the plaintiffs "alleged an ongoing violation of federal law and are seeking prospective relief[,] . . . there is an additional factor which must be satisfied in order for Plaintiffs' claim against the Individual Defendants to circumvent Eleventh Amendment immunity: the exception under *Ex parte Young* only applies where the official sued has some connection with the enforcement of the allegedly unconstitutional act."); *e.g. Doe v. Holcomb*, 883 F.3d 971, 977 (7th Cir. 2018) (holding that the Eleventh Amendment barred the plaintiff's suit in federal court against the Attorney General because the Attorney General had "not threatened to do anything, and cannot do anything, to prosecute a violation of" the challenged statute); *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1047 (6th Cir. 2015) ("*Young* does not apply when a defendant state official has neither enforced nor threatened to enforce the allegedly unconstitutional state statute."); *Pennington Seed, Inc. v. Produce Exch. No. 299*, 457 F.3d 1334, 1342 (Fed. Cir. 2006) ("When a violation of federal law is alleged, as here, the state official whose actions violate that law is the rightful party to the suit and prospective injunctive relief can only be had against him."); *cf. In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007) ("[A]pplication of the straightforward inquiry suggests that the Eleventh Amendment does not prevent suit against the Superintendent [of Banks of the State of New York, who had seized assets and other property from two failed foreign banks.] The gravamen of the Agency's petition is that *the Superintendent is committing an ongoing violation of federal law* by taking possession of and retaining assets that—under 11 U.S.C. § 304(b) & (c) (empowering a bankruptcy court to enjoin such proceedings and order turnover of the assets, and outlining the legal standards

pursuant to which this relief may be granted)—must be released to the Agency. . . ." (emphasis added)); *Dairy Mart*, 411 F.3d at 372 ("Inasmuch as we accept that the state is incapable of authorizing an unconstitutional act, the *Ex parte Young* exception is not a legal fiction, but rather *involves the infliction of real damage by an officer*, without authority by the state, upon the plaintiff. . . . [A]lthough the people in their sovereign capacity may be immune from suit, it does not follow that officers of the state should share this aspect of sovereignty when they violate the laws of the people." (emphasis added)); *CSX Transp.*, 306 F.3d at 98 ("The doctrine of *Ex Parte Young* is a limited exception to the general principle of sovereign immunity and allows a suit for injunctive relief *challenging the constitutionality of a state official's actions in enforcing state law* under the theory that such a suit is not one against the State, and therefore not barred by the Eleventh Amendment." (emphasis added)).

"In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party." *Ex parte Young*, 209 U.S. at 157, 28 S. Ct. 441; *accord Dairy Mart*, 411 F.3d at 372-73; *see also Nassau & Suffolk Cnty. Taxi Owners*, 336 F. Supp. 3d at 68 ("That a government official must have a connection to the allegedly unconstitutional government act makes sense, for an injunction may issue only in circumstances where the state official has the authority to perform the required act.") "It has not, however, been held that it was necessary that such duty should be declared in the same act which is to be enforced." *Ex parte Young*, 209 U.S. at 157, 28 S. Ct. 441; *see also Dairy Mart*, 411 F.3d at 373 ("So long as there is such a connection, it is not necessary that the officer's enforcement duties be noted in the act.") "The fact that the state officer, by virtue of his office, has some connection

with the enforcement of the act, is the important and material fact, and whether it arises out of the general law, or is specially created by the act itself, is not material so long as it exists." *Ex parte Young*, 209 U.S. at 157, 28 S. Ct. 441. Thus, the question is whether the Attorney General has, "by the law of the state, so far as concerns [Part A of CEEFPA], any duty with regard to the enforcement of the same." *Id.* at 160, 28 S. Ct. 441.

In *Ex parte Young*, the Supreme Court reviewed the Minnesota Attorney General's commitment for contempt for violating a temporary injunction issued by a federal court, which enjoined him from enforcing and imposing what stockholders of a railroad believed were onerous rates on railroads imposed in that state pursuant to two allegedly unconstitutional acts of the state legislature, by commencing mandamus proceedings for the purpose of enforcing the law of that state. 209 U.S. at 126-134, 28 S. Ct. 441. The Supreme Court found that the attorney general, "as a state officer attempting to enforce an unconstitutional state statute," *Dairy Mart*, 411 F.3d at 372, *i.e.*, by commencing the mandamus proceedings, was a proper party because:

> "under his power existing at common law, and by virtue of . . . various [Minnesota] statutes, had a general duty imposed upon him, which includes the right and the power to enforce the statutes of the state, including, of course, the act in question, if it were constitutional. His power by virtue of his office sufficiently connected him with the duty of enforcement to make him a proper party to a suit of the nature of the one now before the United States circuit court [seeking injunctive relief preventing the enforcement of state statutes alleged to be unconstitutional]."[9]

---

[9] Specifically, the Supreme Court found that that under Minnesota common law, "the attorney general might institute, conduct, and maintain all suits and proceedings he might deem necessary for the enforcement of the laws of the state, the preservation of order, and the protection of public rights, and that there were no statutory restrictions in that state limiting the duties of the attorney general in such case[;]" that "Section 3 of chapter 227 of the General Laws of Minnesota, 1905 (same law, § 58, Revised Laws of Minnesota, 1905), imposes the duty upon the attorney general to cause proceedings to be instituted against any corporation whenever it shall have offended against the laws of the state[;]" and that "[b]y § 1960 of the Revised Laws of 1905 it is also provided that the attorney general shall be *ex officio* attorney for the railroad commission, and it is made his duty to institute and prosecute all actions which the commission shall order brought, and shall render the commissioners all counsel and advice necessary for the proper performance of their duties." *Ex parte Young*, 209 U.S. at 160-61, 28 S. Ct. 441. Thus, *Ex parte Young* did not rely solely on the attorney general's general enforcement powers. Rather there were two (2) additional factors that demonstrated a particular duty to enforce the statute in question and a willingness to do so: (i) Minnesota had enacted a separate statute expressly making the attorney general the *ex officio* attorney for the railroad commission, with a corresponding "duty to institute and prosecute all actions which the commission shall order brought, and [to] render the commissioners all counsel and advice necessary for the proper performance of their duties;" and (ii) the Attorney

24

*Ex parte Young*, 209 U.S. at 161, 28 S. Ct. 441.

Even before *Ex parte Young*, the Supreme Court held:

> "There is a wide difference between a suit against individuals, holding official
> positions under a state, to prevent them, under the sanction of an unconstitutional
> statute, from committing by some positive act a wrong or trespass, and a suit against
> officers of a state merely to test the constitutionality of a state statute, in the
> enforcement of which those officers will act only by formal judicial proceedings in
> the courts of the state. . . . If, because they were law officers of the state, a case
> could be made for the purpose of testing the constitutionality of the statute, by an
> injunction suit brought against them, then the constitutionality of every act passed
> by the legislature could be tested by a suit against the governor and the attorney
> general, based upon the theory that the former, as the executive of the state, was, in
> a general sense, charged with the execution of all its laws, and the latter, as attorney
> general, might represent the state in litigation involving the enforcement of its
> statutes. That would be a very convenient way for obtaining a speedy judicial
> determination of questions of constitutional law which may be raised by
> individuals, but it is a mode which cannot be applied to the states of the Union
> consistently with the fundamental principle that they cannot, without their assent,
> be brought into any court at the suit of private persons."

*Fitts v. McGhee*, 529-30, 19 S. Ct. 269, 43 L. Ed. 535 (1899). *Ex parte Young* cited most of that

language in *Fitts* in holding that "[i]n making an officer of the state a party defendant in a suit to

enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must

have some connection with the enforcement of the act, or else it is merely making him a party as

a representative of the state, and thereby attempting to make the state a party." *Ex parte Young*,

209 U.S. at 157, 28 S. Ct. 441.

The *Ex parte Young* exception to Eleventh Amendment immunity does not apply in this

case because the Attorney General does not have any connection with the enforcement of the

provisions of CEEFPA Part A that are alleged to be in continued violation of federal law.

---

General had already commenced the mandamus proceedings and, thus, "[b]y his official conduct it seems that he
regarded it as a duty connected with his office to compel the company to obey the commodity act, for he commenced
proceedings to enforce such obedience immediately after the injunction issued, at the risk of being found guilty of
contempt by so doing." *Id.* at 160.

Nothing in Part A of CEEFPA or the general laws of New York charges the Attorney General with a particular duty to enforce the parts of the statute challenged herein. Rather, CEEFPA is administered by the New York court system, which is prohibited by the statute, until May 1, 2021, (i) from accepting for filing any non-complying petition to commence an eviction proceeding; and (ii) from moving forward with pending proceedings, including issuance of eviction warrants, absent satisfaction of all statutory prerequisites. Part A of CEEFPA primarily sets forth procedural requirements with which landlords must comply in order to commence and continue eviction proceedings in New York, including: (1) the Pre-eviction notice requirements, *i.e.*, the requirement to include a form hardship declaration (with landlord's contact information) and list of legal services providers with any pre-eviction notice to a tenant, *id.* § 3; (2) the requirement that any landlord seeking to commence an eviction proceeding attach, with any notice of petition sought to be filed in housing court, an affidavit demonstrating that the form hardship declaration was served as required by the statute and attesting that either the form was not returned or that the tenant was creating a nuisance as defined in the statute, *id.* § 5; and (3) the requirement that any landlord in a pending eviction proceeding file a new petition if the landlord wishes to allege that a tenant is engaging in nuisance behavior but had not so alleged previously, *id.* § 9(1). These litigation-related procedural prerequisites, as well as the "Prohibition on initiation of eviction proceedings," *id.*, § 4, are enforced by court employees, who have responsibility for ensuring parties' compliance with filing requirements before accepting an eviction petition or allowing a preexisting proceeding to move forward.

Similarly, the remainder of CEEFPA Part A's mandates apply primarily to courts and law enforcement officers who execute eviction warrants, *e.g.*, courts are required to stay the initiation of new proceedings and stay current proceedings, except for those involving nuisance tenants or

tenants who do not provide a completed hardship declaration after having been provided one as required by the statute, *id.* §§ 4, 5; no warrant may be issued until the court has held a hearing, and no warrant may be issued until at least May 1, 2021 if the tenant has provided a hardship declaration to the landlord or to the court, *id.* § 8(a); and no warrant may be executed unless it expressly states either that the tenant did not provide a hardship declaration after having been served with the form as required by the statute (including the dates of service by the landlord and by the court), or that the tenant is creating a nuisance, *id.* § 8(b).

Plaintiffs assert, *inter alia*, that the Attorney General has the requisite connection to CEEFPA Part A based on three (3) general state laws, *i.e.*, N.Y. Exec. Law §§ 63(1), 63(12) and 71. (*See* Compl. ¶ 19; Plf. Opp. at 2, 13-17 and 13, n. 3). However, none of those provisions imbues the Attorney General with a particular duty to enforce CEEFPA Part A or administer or oversee the filing of eviction proceedings sufficient to overcome Eleventh Amendment immunity. Plaintiffs' allegations that the Attorney General is responsible for "defending the constitutionality of CEEFPA [Part A] in this action as part of her duty under Executive Law § 63(1)," (Compl., ¶ 19); and that, pursuant to N.Y. Exec. Law § 71, "the AG is further empowered to appear in defense of state statutes whenever their constitutionality is called into question," does not demonstrate the requisite connection with enforcement of the statute. *Mendez v. Heller*, 530 F.2d 457 (2d Cir. 1976); *see also Burke v. Verizon Commc'ns, Inc.*, No. 18 Civ. 4496, 2020 WL 4741043, at *3 (S.D.N.Y. Aug. 17, 2020) (finding that the Attorney General was not a necessary party to the action because the single reference to the Attorney General in the amended complaint alleged, "the NYS Attorney General was added as a required party in order to challenge New York State Labor Law 190 . . . as unconstitutional . . . [and that statute provides that enforcement authority is not even with the NY AG but rather is with the

Commissioner of Labor"), *report and recommendation adopted*, 2020 WL 6538748 (S.D.N.Y. Nov. 6, 2020); *Sabin v. Nelson*, No. 7:12-cv-1373, 2014 WL 2945770, at *2 (N.D.N.Y. June 30, 2014) ("[D]efendants have asserted that enforcement of the New York Human Rights Law rests with the Division of Human Rights, … and there are no allegations to the contrary in [the] complaint. [The plaintiff] has also failed to allege in his complaint how [the New York State Attorney General] . . . ha[s] enforced the particular laws he alleges to be unconstitutional . . . [and,] therefore, offered no basis on which the court could find that [the Attorney General] ha[s] some connection with the enforcement of the statutes in question or any acts taken pursuant thereto."); *Ulrich v. Mane*, 383 F. Supp. 2d 405, 410 (E.D.N.Y. 2005) (finding that the Attorney General had no connection with the enforcement of N.Y. Elec. Law § 6-136(2)(a), and, thus, was not a proper party to the suit, where "[t]he plaintiffs' complaint states that the Attorney General is sued herein solely because this action challenges the constitutionality of provisions of the New York State Election Law."); *Johnson v. Rockefeller*, 58 F.R.D. 42, 46 (S.D.N.Y. 1973) ("Plaintiffs contend that Attorney General Lefkowitz is a proper defendant since all of the named plaintiffs wish to sue the state and the Attorney General is obligated by law to 'defend all actions and proceedings in which the state is interested.' New York Executive Law § 63(1) (McKinney, 1972). . . .  The question is not whether the Attorney General would be obligated, if the plaintiffs at a future time institute suit against the state, to defend that suit, but rather whether he is obligated to enforce the statute here attacked. No such obligation exists and, accordingly, the motion to dismiss as to the Attorney General is granted.").

In *Mendez*, the Second Circuit held that since the Attorney General of the State of New York had no connection with the enforcement of the statute the plaintiff challenged as unconstitutional, *i.e.*, the durational residency requirement of N.Y. Dom. Rel. Law § 230(5), he

could not be a party to the suit. *Mendez*, 530 F.2d at 460. The Court held that although the Attorney General "has a duty to support the constitutionality of challenged state statutes, N.Y. Exec. Law § 71 (McKinney 1972), and to defend actions in which the state is 'interested', N.Y. Exec. Law § 63(1) (McKinney 1972), the Attorney General does so, not as an adverse party, but as a representative of the State's interest in asserting the validity of its statutes." *Id.*

Moreover, contrary to Plaintiffs' contention, the Attorney General's discretionary authority to seek enforcement against "illegal acts" under Executive Law § 63(12) does not bestow a particular duty upon her to enforce Part A of CEEFPA sufficient to invoke the *Ex parte Young* exception to sovereign immunity. The Attorney General is authorized under Executive Law § 63(12) to seek, *inter alia*, an injunction "[w]henever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business." N.Y. Exec. Law § 63(12). Although this statute would allow the Attorney General to pursue claims against those who engage in repeated or persistent violations of CEEFPA, it does not create a particular duty to enforce Part A of CEEFPA itself that would make the Attorney General the appropriate state defendant for a pre-enforcement lawsuit like this one seeking prospective relief. *See HealthNow New York, Inc. v. New York*, 739 F. Supp. 2d 286, 295 (W.D.N.Y. 2010) ("[T]he Attorney General's general authority to investigate and enforce the laws of New York State pursuant to Executive Law § 63(12) is not a sufficient connection to support an exception to sovereign immunity under *Ex parte Young* for the Attorney General to be a proper party in the instant case"), *aff'd on other grounds*, 448 F. App'x 79 (2d Cir. Sept. 12, 2011) (summary order). Indeed, because Executive Law § 63(12) gives the Attorney General broad authority to investigate and pursue claims for injunctive relief whenever a person engages in any repeated or persistent illegality in the conduct

of business, relying solely on § 63(12) to find a particular duty to enforce a specific state law would impermissibly allow lawsuits against the Attorney General to try to invalidate nearly any statute that regulates "the carrying on, conducting or transaction of business." *HealthNow*, 739 F. Supp. 2d at 297 ("If a federal case could be made for the purpose of testing the constitutionality of a state statute merely by naming any state official in an injunction suit, the limited exception of *Ex parte Young* would be stretched far beyond its intended purpose."); *see also Children's Healthcare is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1416 (6th Cir. 1996) ("Holding that a state official's obligation to execute the laws is a sufficient connection to the enforcement of a challenged statute would extend *Young* beyond what the Supreme Court has intended and held." (citing, *inter alia*, *Mendez*, 530 F.2d at 460)); *Shell Oil Co. v. Noel*, 608 F.2d 208, 211 (1st Cir. 1979) ("[T]he mere fact that an attorney general has a duty to prosecute all actions in which the state is interested [is not] enough to make him a proper defendant in every such action.").

*HealthNow* challenged the constitutionality of New York's Anti–Subrogation Law, codified at N.Y. Gen. Oblig. Law § 5-335. The district court held, *inter alia*, that "[t]he general authority to enforce the laws of the state is not sufficient to name a state officer as a defendant in an action challenging a law," *HealthNow*, 739 F. Supp. 2d at 294, and that "[f]or a state officer to be a proper party, both a 'particular duty to enforce the statute in question' and a 'demonstrated willingness to exercise that duty' are needed."[10] *Id.*; *accord Kelly v. New York State Civ. Serv. Comm'n*, No. 14 CV 716(VB), 2015 WL 861744, at *3 (S.D.N.Y. Jan. 26, 2015), *aff'd*, 632 F.

---

[10]   Plaintiffs challenge *HealthNow*'s holding "that 'a "particular duty to enforce the statute in question" and a "demonstrated willingness to do so" are needed' to name a state official as a defendant," (Plf. Opp. at 11-12 (quoting 739 F. Supp. 2d at 294 (quoting *Ex parte Young*, 209 U.S. at 161)), on the basis that "no such language appears in *Ex Parte Young*." (Plf. Opp. at 11-12). While the quote by *HealthNow* may be erroneous, *Ex parte Young* does, in fact, hold that "individuals who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state, *and who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act*, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action." 209 U.S. at 155-56, 28 S. Ct. 441 (emphasis added).

App'x 17 (2d Cir. Jan. 25, 2016) ("[T]o avoid the Eleventh Amendment bar, the state officer against whom prospective relief is sought must have some connection with the enforcement of the act that is in continued violation of federal law."); *see also Citizens Union of City of N.Y. v. Att'y Gen. of N.Y.*, No. 16 Civ. 9592, 2017 WL 2984167, at *4 (S.D.N.Y. June 23, 2017) ("[T]o avoid the Eleventh Amendment bar, the state officer against whom prospective relief is sought must have some connection with the enforcement of the act that includes both a particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty."); *Hendrickson v. AFSCME Council 18*, --- F.3d ---, 2021 WL 1152656, at *11 (10th Cir. Mar. 26, 2021) ("*Ex parte Young* does not require that the state official have a 'special connection' to the unconstitutional act or conduct. . . . But it does require that the state official have a particular duty to 'enforce' the statute in question and a demonstrated willingness to exercise that duty."); *281 Care Comm. v. Arneson*, 766 F.3d 774, 797 (8th Cir. 2014) ("The *Ex parte Young* exception only applies against officials who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution.").

"A plaintiff properly invokes the *Ex parte Young* exception only when state officials are actively violating federal law or imminently threatening acts that the plaintiff challenges as unconstitutional." *HealthNow*, 739 F. Supp. 2d at 294. The district court found, *inter alia*, that since the Attorney General of the State of New York was "nowhere tasked with the enforcement of the Anti–Subrogation Law—neither by the Anti–Subrogation Law itself, nor by a special charge within the state's Executive Law § 63(12), . . . the Attorney General lacks the required enforcement 'connection.'" *Id.* at 295. The court further held that "the Attorney General's general authority to investigate and enforce the laws of New York State pursuant to Executive

Law § 63(12) is not a sufficient connection to support an exception to sovereign immunity under
*Ex parte Young* for the Attorney General to be a proper party in the instant case." *Id.*

The cases Plaintiffs cite which found that the Attorney General was a proper party are
distinguishable.  In *Federal National Mortgage Association v. Lefkowitz*, 383 F. Supp. 1294
(S.D.N.Y. 1974), the plaintiff challenged the constitutionality of Chapter 119 of the Laws of
1974, requiring mortgage investing institutions, such as the plaintiff, "to pay interest of at least
two percent on 'escrow accounts'."  *Id.* at 1295.  The district court found that N.Y. Exec. Law §
63(12) sufficiently established the attorney general's status as a party in that case because
pursuant to that statute:

> "the Attorney General can affirmatively seek an injunction whenever a person
> engages in repeated illegal acts or otherwise demonstrates persistent illegality in
> the carrying on, conducting or transaction of business. If FNMA fails to comply
> with the provisions of Chapter 119, it would be engaging in such repeated and
> persistent violations of a statute. Chapter 119 places on plaintiff a continuing
> obligation to pay interest on its 'escrow accounts'. It should be noted that FNMA
> estimates that it holds about $5.6 million in 'escrow accounts' established under
> 13,990 FHA-insured or VA guaranteed pre-August 10, 1970 mortgages, all secured
> by property in New York State. Since these mortgages have an average life of about
> twelve years, FNMA's liability— if the rate set by the banking board were only
> two percent— would be $112,000 per year, or over $1.3 million during the twelve
> year period. Failure to make such annual payments would clearly amount to the
> type of persistent, illegality which the State Attorney General could attempt to
> enjoin under § 63(12). Thus, the requirement of *Ex Parte Young, supra*, 209 U.S.
> 123, 28 S. Ct. 441, 52 L. Ed. 714— that there exist some connection with the
> enforcement of Chapter 119 by virtue of the office held by the party defendant—
> is met."

*Id.* at 1296-97.  Unlike CEEFPA Part A, which merely imposes litigation-related procedural
requirements with which Plaintiffs must comply in order to commence and prosecute eviction
proceedings in New York state courts, the law at issue in that case imposed upon the plaintiff a
continuing obligation, *i.e.*, to pay interest to mortgage investing institutions.  The district court
found that the plaintiff, by bringing the action seeking an injunction enjoining the allegedly

32

unconstitutional law, "ha[d] announced its intention to defy the statute in its entirety and utterly to ignore its mandate [to pay interest to mortgage investing institutions];" and held, "[s]urely such defiance, if carried out, would constitute persistent conduct sufficient to trigger the Attorney General's § 63(12) obligation to enforce the law." *Id.* at 1297; *cf. HealthNow*, 739 F. Supp. 2d at 296 (distinguishing *Lefkowitz* on the basis, *inter alia*, that the challenged statute assigned an affirmative obligation to the plaintiffs with which they failed or refused to comply); *cf. Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381, 112 S. Ct. 2031, 119 L. Ed. 2d 157 (1992) ("In *Ex parte Young*, . . . we held that this doctrine [that courts of equity should not act when the moving party has an adequate remedy at law] does not prevent federal courts from enjoining state officers who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution. When enforcement actions are imminent--and at least when repetitive penalties attach to continuing or repeated violations and the moving party lacks the realistic option of violating the law once and raising its federal defenses--there is no adequate remedy at law.").  To the contrary, Plaintiffs have not alleged or indicated in any way that they intend to participate in any repeated or persistent violations of Part A of CEEFPA sufficient to trigger a duty on the part of the Attorney General to act under N.Y. Exec. Law § 63(12).

The case *Schoenefeld v. New York*, No. 1:09–CV–0504, 2010 WL 502758 (N.D.N.Y. Feb. 8, 2010), is also distinguishable because that case challenged that constitutionality of the alleged requirement of § 470 of the New York State Judiciary Law that a nonresident New York attorney "may not practice law in the State of New York unless she maintains an office located in the state."  2010 WL 502758, at *1.  The district court found that the Attorney General had "some connection to the alleged violation" and was a proper party to the action because the

Attorney General "is tasked with enforcing laws prohibiting the unlawful practice of law" under N.Y. Jud. Law § 476-a. *Schoenefeld*, 2010 WL 502758, at *4.  Unlike *Schoenfeld*, the Attorney General is not statutorily tasked with enforcing any of the challenged provisions of Part A of CEEFPA.

In *Association of American Medical Colleges v. Carey*, 482 F. Supp. 1358 (N.D.N.Y. 1980), the district court found that N.Y. Exec. Law §§ 63 (1) and (12) were sufficient to name the Attorney General as a defendant in the action[11], holding, in pertinent part:

> "While the Court is not prepared to state that the foregoing provisions would in every case provide a sufficient basis for making the Attorney General a defendant, they suffice in this instance. Although it is true that the Commissioner of Education has the duty to enforce the Education Law pursuant to § 305(1), in his initial impact statement on the Testing Law, dated October 16, 1979, Commissioner Ambach, while admitting an obligation to monitor compliance with the law, stated that violations would be brought to the attention of the Attorney General. Furthermore, the Court is aware that plaintiff does not look favorably upon the testing legislation and could conceivably choose to violate its provisions, in which case the Attorney General would be empowered to act under the Executive Law s 63(12) to enjoin the violations. *See Federal National Mortgage Ass'n. v. Lefkowitz, supra.*"

*Id.* at 1364.  However, this Court is not persuaded by the district court's holding in that case, particularly in light of *Mendez*, to which the decision makes no reference.[12]  Discretionary authority to seek relief for any source of illegality under N.Y. Exec. Law § 63(12) is not the same as a particular duty to enforce a specific statute sufficient to invoke the *Ex parte Young* exception to Eleventh Amendment immunity.

---

[11]  The district court's reliance upon N.Y. Exec. Law § 63(1) directly contravenes the Second Circuit's holding in *Mendez*, 530 F.2d at 460.

[12]  Indeed, "subsequent decisions from courts in this Circuit have declined to follow *Carey*, some going as far to say it 'has been soundly rejected.'" *Citizens Union*, 2017 WL 2984167, at *4  (quoting *United States v. New York*, No. 5:04-CV-00428, 2007 WL 951576, at *2 (N.D.N.Y. Mar. 27, 2007)); *see, e.g. Warden v. Pataki*, 35 F. Supp. 2d 354, 359 (S.D.N.Y. 1999) (rejecting *Carey* and dismissing claims against the State Defendants on the basis that "the vast majority of courts to consider the issue have held . . . that a state official's duty to execute the laws is not enough by itself to make that official a proper party in a suit challenging a state statute." (citing cases including *Mendez*)), *aff'd sub nom Chan v. Pataki*, 201 F.3d 430, 1999 WL 1012404 (Table) (2d Cir. Oct. 20, 1999) (unpublished opinion).

The case *Arkansas United v. Thurston*, No. 5:20-CV-5193, 2021 WL 411141 (W.D. Ark. Feb. 5, 2021), cited by Plaintiffs as support for their contention that the Attorney General cannot "credibly claim that she has no willingness" to enforce Part A of CEEFPA "[i]n light of the AG's public guidance regarding the implementation of CEEFPA and its Hardship Declaration requirements, as well as her demonstrated willingness to enforce New York's eviction *moratoria*," (Plf. Opp. at 15), is inapposite.  The plaintiffs in that case sought an injunction: (i) prohibiting enforcement of state statutes challenged as violating the Supremacy Clause of the Constitution and being preempted by Section 208 of the Voting Rights Act ("VRA"), 52 U.S.C. § 10508; and (ii) directing Defendants to implement a remedial plan to ensure that voters with limited English proficiency are permitted to receive assistance from an individual of their choice when voting in future elections."[13]  *Thurston*, 2012 WL 411141 at *2.  In finding that the State Defendants, including the Secretary of State of Arkansas and the members of the Arkansas State Board of Election Commission, were proper defendants, the district court relied upon the plaintiffs' allegations "that the state Board of Election Commissioners 'is responsible for, among other duties, providing statewide guidance and training to election officers and county election commissioners' and that the Board 'issues a manual of procedures for county election commissions as well as additional training materials for election officials[;]' . . . [and that] Secretary Thurston is the chairperson of the Board and oversees the state Election Division." *Id.*

---

[13] "Under Arkansas Code § 7-1-103(a)(19)(C) and (b)(1), a person who assists a voter 'in marking and casting the voter's ballot except as provided in § 7-5-310' is potentially subject to criminal misdemeanor penalties. While Section 7-5-310(4)(A)(i) provides that the voter may be assisted by a person of his or her choice, Section 7-5-310(b)(4)(B) adds the restriction that '[n]o person other than [poll workers] shall assist more than six (6) voters in marking and casting a ballot at an election[.]' Section 7-5-310(b)(5) further provides that '[i]t shall be the duty of the poll workers at the polling site to make and maintain a list of the names and addresses of all persons assisting voters.' Plaintiffs argue[d] that this six-voter limit on assistance under Arkansas law, enforceable by criminal misdemeanor penalties, violates Section 208 of the VRA, which provides that '[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union.' 52 U.S.C. § 10508." *Thurston*, 2021 WL 411141, at * 2.

at *8.  The district court held that, "[i]n pleading that State Defendants *are responsible for training* the county election commissioners on their legal duties, Plaintiffs have shown a sufficient connection with the enforcement of the six-voter limit to allow them to seek relief against those officials under *Ex parte Young*." *Id.* (emphasis added).  Unlike that case, which involved distinct issues of election law and the State Defendants' complete oversight of and responsibility for county election commissioners' training and compliance with all election laws, the Attorney General is not charged under New York state law with complete oversight and responsibility for sheriffs' and law enforcement officers' training and compliance with any law.

Recently, the United States Court of Appeals for the Fifth Circuit held:

> "Although the precise scope of the requirement for a connection has not been defined, the plaintiff at least must show the defendant has the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty. . . .  That means the official must be statutorily tasked with enforcing the challenged law. . . .  Enforcement typically means compulsion or constraint. . . .  A scintilla of 'enforcement' by the relevant state official with respect to the challenged law will do. . . .
>
> Determining whether *Ex parte Young* applies to a state official requires a provision-by-provision analysis, *i.e.*, the official must have the requisite connection to the enforcement of the particular statutory provision that is the subject of the litigation."

*Texas Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 1124 (2021).  The Court further held that "the required connection is not merely the general duty to see that the laws of the state are implemented, but the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty," *id.* at 181; and that the Attorney General's "general duty to enforce the law is insufficient for *Ex parte Young*." *Id.*  In finding that the Attorney General lacked the requisite connection to the challenged law at issue in that case for *Ex parte Young* to apply, the Court held:

> "The plaintiffs also focus us on the letter sent by the Attorney General. True, we applied the *Ex parte Young* exception to this Attorney General after his office sent

to a manufacturer numerous 'threatening letters' that 'intimat[ed] that formal enforcement' of the Texas Deceptive Trade Practices Act 'was on the horizon.' *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 392, 397 (5th Cir. 2015). *Conversely, we have declined to apply Ex parte Young where the Attorney General issued a press release warning that anyone who violated the Governor's recent emergency order would be 'met with the full force of the law.' In re Abbott, 956 F.3d [696,] 709 [5th Cir. 2020][14]. We explained that 'our cases do not support the proposition that an official's public statement alone establishes authority to enforce a law, or the likelihood of his doing so, for Young purposes.' Id.*

Unlike *NiGen*, the Attorney General's letter in this case was sent to judges and election officials, not to the plaintiffs. The letter did not make a specific threat or indicate that enforcement was forthcoming. Nor did it state that the Texas Democratic Party or the other plaintiffs had violated any specific law, as the letter did in *NiGen*, 804 F.3d at 392. Instead, the letter explained that advising voters to pursue disability-based mail-in voting without a qualifying condition constituted a felony under Sections 84.0041 and 276.013 of the Texas Election Code. As a result, we conclude that the letter here did not 'intimat[e] that formal enforcement was on the horizon.' *Id.* Instead, it closely reflected the Attorney General's letter in *In re Abbott*, 956 F.3d at 709. Accordingly, the Attorney General lacks a requisite connection to the challenged law, and *Ex parte Young* does not apply to him."

*Abbott*, 978 F.3d at 181 (emphasis added).

Plaintiffs cite no authority, nor did the Court find any, for the proposition that an official's public statements and guidance to other state officials are sufficient to establish either the official's authority to enforce a law or her willingness to do so. To the contrary, as set forth above, the Fifth Circuit expressly rejected that proposition, and *Ex parte Young* suggests that the official's connection with the enforcement of the act must arise out of the state's law, whether it be by the challenged act itself or the general law. *See Ex parte Young*, 209 U.S. at 157, 28 S. Ct. 441; *see also HealthNow*, 739 F. Supp.2d at 295 ("The actual enforcement connection may be found either in the challenged statute itself or the general laws of the state. . . . While it is not necessary that the officer's enforcement duties be noted in the act, . . . the connection can be

---

[14]  The Supreme Court of the United States subsequently granted certiorari, vacated the judgment entered in *In re Abbott*, 956 F.3d 696, and remanded the case to the Fifth Circuit with instructions to dismiss the case as moot. *Planned Parenthood Ctr. for Choice v. Abbott*, 141 S. Ct. 1261 (2021) (citing *United States v. Munsingwear, Inc.*, 340 U.S. 36, 71 S. Ct. 104, 95 L. Ed. 2d 36 (1950)).

found implicitly elsewhere in the laws of the state [] so long as those duties have the same effect as a special charge in the challenged statute."); *Kelly*, 2015 WL 861744, at *3 (accord). Indeed, *Ex parte Young* phrased the relevant question as being "whether the attorney general had, *by the law of the state*, so far as concerns the[] . . . acts [at issue], any duty with regard to the enforcement of the same." *Id.* at 160 (emphasis added).

The Attorney General's provision of general guidance about the plain terms of Part A of CEEFPA to those charged with enforcing its provisions does not demonstrate either that the Attorney General has a particular duty to enforce Part A of CEEFPA or the requisite willingness to do so against Plaintiffs. Indeed, the fact that the Attorney General provided general information to the local law enforcement officers who are directly responsible for complying with the restrictions on the execution of eviction warrants in Part A of CEEFPA underscores that it is other state and local officials, rather than the Attorney General, who have the particular duty to administer or enforce the provisions of CEEFPA Part A. To hold that general guidance to local officials about their responsibilities in administering a state statute equates to a particular duty to enforce the statute would impermissibly extend the limited exception of *Ex parte Young* far beyond its intended purpose. Since neither CEEFPA itself nor the Attorney General's general authority under N.Y. Executive Law §§ 63(1), 63(12) or 71 charges her with a particular duty to enforce Part A of CEEFPA, the *Ex parte Young* exception to Eleventh Amendment immunity does not apply in this case. Without the required enforcement connection to Part A of CEEFPA, the Attorney General is not a proper party to this action. Accordingly, Defendant's motion to dismiss is granted and this case is dismissed in its entirety for lack of subject matter jurisdiction.[15]

---

[15]  In light of this determination, Plaintiffs' motion for a preliminary injunction is denied.

III.     CONCLUSION

For the reasons set forth herein, the Attorney General's motion to dismiss is granted, this

case is dismissed in its entirety for lack of subject matter jurisdiction, and Plaintiffs' motion for a

preliminary injunction is denied.

SO ORDERED.

_/s/ JOANNA SEYBERT__ _
Joanna Seybert
United States District Judge

Dated:  April 14, 2021
          Central Islip, New York